No. 22-10669

# United States Court of Appeals

*for the*

# Eleventh Circuit

———————————————

In re: JANUARY 2021 SHORT SQUEEZE TRADING LITIGATION,

ANDREA JUNCADELLA, EDWARD GOODAN, WILLIAM MAKEHAM,
MARK SANDERS, JAIME RODRIGUEZ, *et al.*,

*Plaintiffs-Appellants,*

PATRICK YOUNG, *et al.*,

*Plaintiffs,*

– v. –

ROBINHOOD FINANCIAL LLC, ROBINHOOD SECURITIES, LLC,
ROBINHOOD MARKETS, INC.,

*Defendants-Appellees,*

CITADEL LC, d.b.a. Citadel Securities, *et al.*,

*Defendants.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
(HONORABLE CECILIA M. ALTONAGA, NO. 1:21-MD-02989-CMA
CHIEF U.S. DISTRICT JUDGE)

## INITIAL BRIEF OF PLAINTIFFS-APPELLANTS

NATALIA M. SALAS
JAMES L. FERRARO
JAMES FERRARO, JR.
SEAN A. BURSTYN
ANGELICA NOVICK
DANIEL J. DIMATTEO
THE FERRARO LAW FIRM, P.A.
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
(305) 375-0111

JESSE PANUCCIO
CARL E. GOLDFARB
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Boulevard,
 Suite 1200
Fort Lauderdale, Florida 33301
(954) 356-0011

*Attorneys for Plaintiffs-Appellants*

*(For Continuation of Appearances See Inside Cover)*

RACHEL W. FURST
GROSSMAN ROTH YAFFA COHEN, P.A.
2525 Ponce de Leon Boulevard,
    Suite 1150
Coral Gables, Florida 33134
(305) 442-8666

BRIANNA S. HILLS
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
(212) 754-4542

*Attorneys for Plaintiffs-Appellants*

## <u>AMENDED CERTIFICATE OF INTERESTED PERSONS</u>
## <u>AND CORPORATE DISCLOSURE STATEMENT</u>

I certify that, to the best of my knowledge, the following is a complete list of all persons and entities known to have an interest in the outcome of this appeal. Pursuant to 11th Cir. R. 26.1-4, newly added names and entities are in bold.

1. Altonaga, Cecilia M. (U.S. District Judge)

2. Anderson, Eric D. Monek

3. **Atherton, Blake**

4. Boies Schiller Flexner LLP

5. Burstyn, Sean Alexander

6. Castellanos Alvarado, Maria Alina

7. **Chelin Law Firm**

8. Cornwell, Jonathan

9. Crass, Kevin A.

10. Cravath, Swaine & Moore LLP

11. Daniluk, Joseph

12. Danon, Samuel

13. Diessel, Benjamin H.

14. **DiMatteo, Daniel J.**

15. Doroghazi, John M.

16. Feltoon, Robert N.

i

17.   The Ferraro Law Firm, P.A.

18.   Ferraro, James L.

19.   Ferraro, James Louis Jr.

20.   Furst, Rachel W.

21.   Goldfarb, Carl E.

22.   Gonzalez, Sammy

23.   Goodan, Edward

24.   Grossman Roth Yaffa Cohen, P.A.

25.   Gutierrez, Mathew Daniel

26.   Hill, Cody

27.   Hills, Brianna S.

28.   Hunton Andrews Kurth LLP

29.   Huynh, Andrew D.

30.   Juncadella, Andrea

31.   Kang, Grace

32.   Krasowski, Patryk

33.   Kunselman, Shane

34.   Kwatinetz, Jeffrey E.

35.   Makeham, William

36.   Membiela, Gustavo J.

37.   Moody, Julie

38.   Murray, Elizabeth Robben

39.   **Novick, Angelica**

40.   Orsini, Kevin J.

41.   Panuccio, Jesse M.

42.   **Pessah Law Group, PC**

43.   Reilly, Craig Crandall

44.   Rim, Naeun

45.   Robinhood Financial LLC

46.   Robinhood Markets, Inc.

47.   Robinhood Securities, LLC

48.   Rodriguez, Jaime

49.   Rutenberg, Craig Steven

50.   Ryan, Antony L.

51.   Salas, Natalia

52.   Sanders, Mark

53.   Sukiennik, Brittany L.

54.   Volker, Odean L.

55.   Waggoner, Dennis Parker

56.   Webb, Joshua Clark

57.    Wisoff, Carl Brandon

Respectfully submitted,

_s/ Jesse Panuccio_

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Ste 1200
Fort Lauderdale, FL 33301
Tel: (954) 356-0011
jpanuccio@bsfllp.com

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument.  This multi-issue appeal presents the substantial question of whether a stockbroker's use of modern technology to provide brokerage services absolves it of all state law duties to its clients.  Appellants respectfully submit that the decisional process will be aided by the Court's opportunity to question the parties regarding their arguments.

# **TABLE OF CONTENTS**

STATEMENT REGARDING ORAL ARGUMENT ................................................v

STATEMENT OF JURISDICTION...........................................................................1

STATEMENT OF ISSUES .......................................................................................1

INTRODUCTION .....................................................................................................2

STATEMENT OF THE CASE...................................................................................4

    I.      STATEMENT OF FACTS....................................................................4

          A.     Background on Robinhood ........................................................4

               1.     Robinhood Is a Stockbroker. .............................................4

               2.     Robinhood Targets and Services Novice Investors and Encourages Them to Engage in High-Volume, High-Risk Trading.................................................................................6

               3.     Robinhood's Tactics Have Resulted in Exponential Growth and Huge Profits.................................................8

               4.     As a Stockbroker, Robinhood Is Subject to Industry Standards of Care, and Its Tactics Have Been the Subject of Regulatory Scrutiny and Record-Setting Fines............9

          B.     The January 2021 Short Squeeze ...............................................11

          C.     The $3 Billion Capital Call and Trading Shutdown .................16

    II.     COURSE OF PROCEEDINGS BELOW ...........................................19

    III.    STANDARD OF REVIEW ...............................................................20

SUMMARY OF ARGUMENT ...............................................................................20

ARGUMENT ..........................................................................................................21

I.      PLAINTIFFS STATE VIABLE TORT CLAIMS UNDER THE
        LAWS OF BOTH FLORIDA AND CALIFORNIA, BUT TO THE
        EXTENT A CONFLICT EXISTS, FLORIDA LAW APPLIES........21

II.     THE DISTRICT COURT ERRED IN DISMISSING THE
        FIDUCIARY-DUTY CLAIM (COUNT III). ....................................23

III.    THE DISTRICT COURT ERRED IN DISMISSING THE
        NEGLIGENCE CLAIMS (COUNTS I & II). ...................................35

IV.     THE DISTRICT COURT ERRED IN DISMISSING IMPLIED-
        COVENANT-OF-GOOD-FAITH-AND-FAIR-DEALING CLAIM
        (COUNT V)...........................................................................................49

V.      THE DISTRICT COURT ERRED IN DISMISSING IMPLIED-
        DUTY-OF-CARE CLAIM (COUNT IV)..........................................54

VI.     THE DISTRICT COURT ERRED IN DISMISSING TORTIOUS-
        INTERFERENCE CLAIM (COUNT VI)..........................................55

VII.    TO THE EXTENT ADDITIONAL FACTUAL ALLEGATIONS
        ARE NECESSARY TO STATE A CLAIM, PLAINTIFFS SHOULD
        BE GIVEN LEAVE TO AMEND. ....................................................56

CONCLUSION ....................................................................................................57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Barenborg v. Sigma Alpha Epsilon Fraternity*,
    244 Cal.Rptr. 3d 680 (Cal. Ct. App. 2019)..........................................................46

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..........................................................................................26

*Best Buy Stores, L.P. v. Manteca Lifestyle Ctr., LLC*,
    859 F.Supp.2d 1138 (E.D. Cal. 2012) ................................................... 50, 51, 52

*Bily v. Arthur Young & Co.*,
    834 P.2d 745 (Cal. 1992) ...................................................................................35

*Blue Cross Blue Shield of Ala., Inc. v. Nielsen*,
    116 F.3d 1406 (11th Cir. 1997) ..........................................................................44

*Brown v. California Pension Adm'rs & Consultants, Inc.*,
    52 Cal.Rptr.2d 788 (Cal. Ct. App. 1996)............................................................30

*Brown v. USA Taekwondo*,
    483 P.3d 159 (Cal. 2021) ............................................................................. 35, 45

*Bus. Credit Mgmt. Inc. v. Med. Faculty Assocs. Inc.*,
    2012 WL 13012683 (C.D. Cal. Aug. 8, 2012) ...................................................56

*Careau & Co. v. Security Pac. Bus. Credit, Inc.*,
    272 Cal.Rptr. 387 (Cal. Ct. App. 1990)....................................................... 50, 52

*Carma Developers, Inc. v. Marathon Development Cal., Inc.*
    826 P.2d 710 (Cal. 1992) ............................................................................. 50, 51

*Christie v. Royal Caribbean Cruises, Ltd.*,
    497 F. Supp. 3d 1227 (S.D. Fla. 2020) ...............................................................37

*Clay Elec. Co-op v. Johnson*,
    873 So. 2d 1182 (Fla. 2003) ................................................................... 36, 38, 39

*Cooper v. Meridian Yachts, Ltd.*,
    575 F.3d 1151 (11th Cir. 2009) ..........................................................................23

*Duffy v. Cavalier*,
264 Cal.Rptr. 740 (Cal. Ct. App. 1989) ........................................... 24, 29, 33, 34

*First Union Brokerage v. Milos*,
717 F. Supp. 1519 (S.D. Fla. 1989) ............................................................ 28, 29

*Florida Power & Light Co. v. Westinghouse Elec. Corp.*,
510 So.2d 899 (Fla. 1987) .................................................................................43

*Gallagher v. Jones*,
129 U.S. 193 (1889).............................................................................................23

*Gochnauer v. A.G. Edwards & Sons, Inc.*
810 F.2d 1042 (11th Cir. 1987) ....................................................... 24, 28, 29, 31

*Godelia v. Doe 1*,
881 F.3d 1309 (11th Cir. 2018) .........................................................................20

*Great Lakes Ins., SE v. SARL JFL, FI*,
2021 WL 6134788, (S.D. Fla. Oct. 8, 2021) ....................................................37

*Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*,
341 F.3d 1292 (11th Cir. 2003) .........................................................................22

*Haggarty v. Wells Fargo Bank, N.A.*,
2011 WL 445183 (N.D. Cal. Feb. 2, 2011) ......................................................53

*Hebei Hengbo New Materials Tech. Co. v. Apple, Inc.*,
344 F.Supp.3d 1111 (N.D. Cal. 2018)...............................................................53

*Holguin v. Dish Network LLC*,
178 Cal.Rptr.3d 100 (Cal. Ct. App. 2014).........................................................55

*In re Marjory Stoneman Douglas High Sch. Shooting FTCA Litig.*,
482 F. Supp. 3d 1273 (S.D. Fla. 2020) ..............................................................37

*In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*,
2022 WL 1468057 (May 10, 2022) ....................................................................37

*In re Nuveen Funds/City of Alameda Sec. Litig.*,
2011 WL 1842819 (N.D. Cal. May 16, 2011)....................................................29

*Indem. Ins. Co. of N. Am. v. American Aviation, Inc.*,
  891 So.2d 532 (Fla. 2004) ...................................................................43

*Issakhani v. Shadow Glen Homeowners Assn., Inc.*,
  278 Cal.Rptr. 3d 270 (Cal. Ct. App. 2021) .........................................45

*J'Aire Corp. v. Gregory*,
  598 P.2d 60 (Cal. 1979) ......................................................................45

*Jackson Hewitt, Inc. v. Kaman*,
  100 So.3d 19 (Fla. 2011) .....................................................................35

*Kantrow v. Celebrity Cruises, Inc.*,
  510 F.Supp.3d 1311 (S.D. Fla. 2020) ..................................................37

*Kennedy v. Budd*,
  5 A.D. 140 (N.Y. App. Div. 1896) ......................................................24

*Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  461 F.Supp. 951 (E.D. Mich. 1978) ....................................................25

*Limbaugh v. Merrill, Lynch, Pierce, Fenner & Smith*,
  732 F.2d 859 (11th Cir. 1984) .............................................................34

*Limones v. School Dist. of Lee Cnty.*,
  161 So.3d 384 (Fla. 2015) ...................................................................37

*Locke v. Warner Bros., Inc.*,
  66 Cal.Rptr.2d 921 (Cal. Ct. App. 1997) ............................................52

*Luis v. RBC Cap. Markets, LLC*,
  984 F.3d 575 (8th Cir. 2020) ...............................................................40

*McCain v. Florida Power Corp.*,
  593 So.2d 500 (Fla. 1992) ................................................... 36, 39, 41

*McDaniel v. Wells Fargo Invs., LLC*,
  717 F.3d 668 (9th Cir. 2013) ...............................................................40

*McGillis v. Dep't of Econ. Opportunity*,
  210 So. 3d 220 (Fla. 3d DCA 2017) ....................................................28

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*,
    697 F.Supp. 1224 (D.D.C. 1998) .........................................................................41

*Monroe v. Sarasota Cnty. Sch. Bd.*,
    746 So.2d 530 (Fla. 2d DCA 1999) .....................................................................44

*Moreno v. Sanchez*,
    131 Cal.Rptr.2d 684 (Cal. Ct. App. 2003) ...........................................................48

*Muchnick v. Goihman*,
    245 So. 3d 978 (Fla. 3d DCA 2018) .....................................................................37

*N. Am. Chem. Co. v. Superior Ct.*,
    69 Cal.Rptr.2d 466 (Cal. Ct. App. 1997) .............................................................54

*NetChoice, LLC v. Attorney Gen.*,
    34 F.4th 1196 (11th Cir. 2022) .............................................................................28

*Petersen v. Securities Settlement Corp.*,
    277 Cal.Rptr. 468 (Cal. Ct. App. 1991) ......................................................... 30, 34

*Petro-Diamond Inc. v. SCB & Assocs., LLC*
    122 F.Supp.3d 949 (C.D. Cal. 2015) ............................................................. 29, 34

*Pinchasov v. Robinhood Financial, LLC*,
    2021 WL 4991144 (S.D.F.L. 2021) ........................................................... 27, 38, 39

*Remington v. Newbridge Sec. Corp.*,
    2013 WL 2444719 (S.D. Fla. June 5, 2013) ........................................................40

*Roscoe Moss Co. v. Jenkins*
    130 P.2d 477 (Cal. 1942) ......................................................................................54

*Ross v. AT&T Mobility, Inc.*,
    2020 WL 9848766 (N.D. Cal. May 14, 2020) ......................................................48

*SFM Holdings, Ltd. v. Banc of America Securities, LLC*,
    600 F.3d 1334 (11th Cir. 2010) ..................................................................... 28, 29, 34

*Sheen v. Wells Fargo Bank, N.A.*,
    505 P.3d 625 (Cal. 2022) ............................................................................. 47, 48, 49

*Sideman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    465 F.Supp. 1233 (S.D.N.Y. 1979) ....................................................................41

*Stonebrae, L.P. v. Toll Bros.*,
    2010 WL 1460208 (N.D. Cal. Apr. 8, 2010) ...................................................53

*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*,
    122 Cal.Rptr. 2d 267 (Cal. Ct. App. 2007) .......................................... 52, 54

*Tamrazian v. UNUM Life Ins. Co. of Am.*,
    2020 WL 4288441 (C.D. Cal. Apr. 14, 2020) ...................................................32

*Tank Tech, Inc. v. Valley Tank Testing. L.L.C.*,
    244 So.3d 383 (Fla. 2d DCA 2018) ....................................................................44

*Third Story Music, Inc. v. Waits*,
    48 Cal.Rptr. 2d 747 (Cal. Ct. App. 1995) ........................................................52

*Thomas v. Farmville Mfg. Co., Inc.*,
    705 F.2d 1307 (11th Cir. 1983) ...........................................................................57

*Tiara Condominium Association, Inc. v. Marsh & McLennan Companies, Inc.*,
    110 So.3d 399 (Fla. 2013) .............................................................. 42, 43, 44

*Twomey v. Mitchum, Jones & Templeton*,
    69 Cal.Rptr. 222 (Cal. Ct. App. 1968) .................................................. 47, 49

*United States v. Dish Network, L.L.C.*,
    954 F.3d 970 (7th Cir. 2020) ...............................................................................32

*Vesely v. Sager*,
    486 P.2d 151 (Cal. 1971) ......................................................................................45

*Ward v. Atlantic Sec. Bank*,
    777 So.2d 1144 (Fla. 3d DCA 2001) ....................................................24, 27, 33

*Wolf v. Walt Disney Pictures & Television*,
    76 Cal.Rptr. 3d 585 (Cal. Ct. App. 2008) ........................................................52

*Woods v. Fox Broadcasting Sub., Inc.*,
    28 Cal.Rptr.3d 463 (Cal. Ct. App. 2005) ........................................................56

*Worthy v. City of Phenix City, Ala.*,
    930 F.3d 1206 (11th Cir. 2019) ..........................................................................26

**Statutes**

28 U.S.C. § 1291 ..........................................................................1

28 U.S.C. § 1332(d)(2)..........................................................................1

**Rules**

Fed. R. Civ. P. 12(b)(6)..........................................................................1

Fed. R. Civ. P. 15 ..........................................................................57

FINRA Rule 2010 ..........................................................................10

FINRA Rule 3110 .......................................................... 10, 40

FINRA Rule 4370 .......................................................... 10, 40

FINRA Rule 5310 .......................................................... 10, 40

**Other Authorities**

1 Witkin, Summary of California Law (Contracts) §800 ..........................56

Restatement (Second) of Torts §285 (1965)..........................................39

Restatement (Third) of Torts: Liab. for Econ. Harm §4 cmt. a (2020) ................48

## STATEMENT OF JURISDICTION

This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §1332(d)(2) because this is a putative class action with aggregate proposed class claims in excess of $5 million and more than 100 putative class members.  Many members of the proposed class are citizens of a state different from Defendants.

On January 27, 2022, the United States District Court for the Southern District of Florida dismissed the Complaint with prejudice under Fed. R. Civ. P. 12(b)(6). Appellants timely filed a Notice of Appeal on February 28, 2022.  This Court has jurisdiction pursuant to 28 U.S.C. §1291 because this is an appeal from the final judgment.

## STATEMENT OF ISSUES

Whether a stockbroker's failure to maintain adequate safeguards against market volatility, and its imposition of trading restrictions designed to harm clients, subjects the stockbroker to liability under state tort and contract law.

## **INTRODUCTION**

In January 2021, one of the nation's largest stockbrokers, Robinhood, imposed on its clients an unprecedented set of trading restrictions, deliberately tanking the market price of thirteen stocks. The restrictions were financially devastating for Robinhood's individual clients, erasing billions of dollars of value invested in their brokerage accounts. Incredibly, Robinhood's CEO, Vlad Tenev, publicly admitted that Robinhood "knew this was a bad outcome for customers" but did it anyway "to protect the firm." The firm was indeed protected. The trading restrictions (1) ensured Robinhood would not have to raise significant capital to cover regulatory requirements and (2) extinguished the demand driving short squeezes that were causing massive losses for favored institutional investors. Far from honoring its namesake, Robinhood stole from novice investors it had spent years soliciting so that the company and wealthy institutional players could benefit from their losses. Plaintiffs seek to hold Robinhood accountable and to recover the losses caused by their stockbroker's breach of duties and negligence.

This case arises at the intersection of Silicon Valley and Wall Street. The question presented is whether the titans of Big Tech are subject to the same rules and duties as conventional stockbrokers or whether they are subject to no rules at all and may advance their self-interest over their clients' interests. The district court took the no-rules approach, holding that one of the country's largest stockbrokers is

immune from *all* common-law duties that apply to other stockbrokers. The court reached this outcome by embracing two contradictory concepts: on the one hand, Robinhood owes no duties to its clients because it supposedly offers only non-discretionary (that is, client-directed) trading services; on the other hand, Robinhood is immune from a failure to execute client directives because it reserves to itself *total* discretion over client accounts.

This heads-I-win-tails-you-lose concept, if permitted to stand, would mean that every online brokerage can take virtually any action to advance its own profits, rig the market for itself or favored clients, and face *no* common-law liability, regardless of whether the action was grossly negligent or in admitted bad faith, and regardless of the harm to clients or the market generally. The common law offers no such license. Big Tech is not a law unto itself. The district court's extreme holding was error, and this Court should reverse.

## STATEMENT OF THE CASE

I. STATEMENT OF FACTS

    A.    **Background on Robinhood**

        1.    *Robinhood Is a Stockbroker.*

The Robinhood family of companies (collectively, "Robinhood") runs a securities brokerage, using web and smartphone app platforms to serve clients. Robinhood operates as a "vertically integrated platform," and the subsidiaries have substantial and revolving lines of credit with the parent. Compl. ¶¶95-99, 227-32.[1] Robinhood Markets, Inc., is the parent; subsidiary Robinhood Financial LLC is registered with the SEC as an introducing broker-dealer; and subsidiary Robinhood Securities, LLC, is registered with the SEC as a clearing broker-dealer. Compl. ¶¶85-101, 110, 123, Ex. A §4. An introducing broker matches retail investors seeking to trade securities. *Id.* ¶90. A clearing broker routes client orders to market makers for execution and submits the trade to a clearinghouse for settlement. *Id.* ¶¶140, 152-53, 156. Early in its corporate life, as a selling point to clients, Robinhood opted to self-clear securities transactions. *Id.* ¶112.

---

[1] The Amended Consolidated Class Action Complaint referenced in the district court's order is found at App. 263-345, and its exhibits are found at App. 346-81. On May 13, 2022, this Court granted Appellants' motion to amend the Complaint to reflect Plaintiffs' states of citizenship to satisfy CAFA's jurisdictional requirement, and second Amended Consolidated Class Action Complaint is found at App. 607-90. All other allegations (and paragraph numbers) remain the same in the second Amended Complaint.

Robinhood requires clients to sign its "Customer Agreement," a non-negotiable "click-wrap" (or adhesion) contract. *Id.* ¶311 & Ex. A ("Agreement" or "Agrmt."). The Agreement is between "Robinhood" (defined as Robinhood Financial *and* Robinhood Securities) and the client, and its purpose is for Robinhood to "open[] one or more accounts on [the client's] behalf … for the purchase, sale or carrying of securities or contracts relating thereto." Agrmt. at 1. Each Robinhood client opens a "self-directed" account and "appoint[s] Robinhood Financial as [the client's] agent for the purpose of carrying out [the client's] directions to Robinhood Financial in accordance with the terms and conditions of this Agreement." *Id.* §4. Such directions include orders to trade securities "and take such other steps as are reasonable to carry out [the client's] directions." *Id.* Each Robinhood client also appoints Robinhood Securities to "clear all transactions, on a fully-disclosed basis" and "understands that Robinhood Securities carries [the client's] Account(s) and is responsible for the clearing and bookkeeping of transactions." *Id.* §6.

Because Robinhood clients are supposed to be self-directed, the parties agree that "neither Robinhood nor any of its employees … provide investment advice" or "make discretionary trades." *Id.* §5A. The Agreement further states, however, that "Robinhood may at any time, in its sole discretion and without prior notice to [the client], prohibit or restrict [the client's] ability to trade securities." *Id.* §5F.

5

The Agreement also states that "[a]ll transactions in [a client] Account will be subject to federal securities laws and regulations, the applicable laws and regulations of any state or jurisdiction in which Robinhood Financial is registered, the rules of any applicable self-regulatory organization of which Robinhood Financial is a member and the rules, regulations, customs and usages of the exchange or market … where the transactions are executed." *Id.* §11.

The Agreement expressly incorporates "other … disclosures," defined as "Website Postings," whether currently in existence or posted in the future, and assumes client consent without further affirmative approval. *Id.* §37E. One such incorporated Website Posting is the "Form CRS Relationship Summary." Compl. Ex. B.

> **2.** ***Robinhood Targets and Services Novice Investors and Encourages Them to Engage in High-Volume, High-Risk Trading.***

Robinhood's purported mission is to "democratize finance for all" and "give everyone—not just the wealthy—access to financial markets." Compl. ¶108. Robinhood claims to "democratize finance" through "commission-free investing." *Id.* ¶109. There is, however, a hidden price: Robinhood receives, from institutional market makers, "payment for order flow," which results in stockbroker profits but less favorable pricing for clients. *Id.* ¶137; Agrmt. §23. Payment for order flow generates 60% of Robinhood's revenue, including $331 million in the first quarter

of 2021. Compl. ¶¶141, 145. Citadel Securities is Robinhood's largest purchaser of order flow and provided 34% of Robinhood's 2020 revenue. *Id.* ¶145.

Payment for order flow is illegal in the United Kingdom and Canada, *id.* ¶143, and is disfavored by the SEC because it "create[s] conflicts of interest for brokers because of the tension between the broker's interests in maximizing … profits generated for itself … and their fiduciary obligation … to route their customers' orders to the best markets." *Id.* ¶144. The SEC specifically found that "'commission free' trading at Robinhood came with a catch: Robinhood's customers received inferior execution prices compared to what they would have received from Robinhood's competitors." *Id.* ¶138. Robinhood's "free" trades thus come at a steep price.

Robinhood's pursuit of payment for order flow drives its business model, which prioritizes client-base growth and trading volume over investor protection. Compl. ¶¶146-51. Robinhood aggressively recruits new clients through high-dollar advertising campaigns targeting novice investors. *Id.* ¶¶115, 121, 201. Once Robinhood signs a client, it encourages high-volume trading by providing: one-click trading; fractional shares; easy access to complicated and risky products (such as short options); margin trading (i.e., trading with borrowed money); behavioral prompts (such as "gamified" app features); predictive analytics; and differential

marketing.  *Id.* ¶¶101, 120, 129-31.  For first-time trades, for example, Robinhood offered falling "confetti" prompts and emoji-filled notifications like the following:



*Id.* ¶130.  These gamified features merge investing with the classic Silicon Valley playbook of driving product use through behavioral nudges.  *Id.* ¶129.  As with social media, these tactics fuel excessive app use and behavior similar to gambling addiction.  *Id.* ¶¶129-32.

### 3. *Robinhood's Tactics Have Resulted in Exponential Growth and Huge Profits.*

Robinhood's tactics have been remarkably effective at attracting new clients and driving trade volume.  Between 2016 and 2021, Robinhood became the stockbroker for *half* of all new, funded retail accounts in the United States.  *Id.* ¶113. Half of those clients were opening their first brokerage account and their median age was only 31.  *Id.* ¶114.  In all, Robinhood has expanded its client base from fewer than 500,000 in 2015 to more than 31 million as of September 2021.  *Id.* ¶116.  In the aggregate, Robinhood clients trade much more frequently than clients of peer

brokerages and are more reactive to changes in stock price. *Id.* ¶¶103, 134. Robinhood's clients also trade the riskiest products at the highest frequency. *Id.*

Robinhood has reaped huge profits from this client growth and account churn: Robinhood grew by nearly 500% between 2019 and 2020, and it increased revenues more than 20,000% between March 2020 and September 2021. *Id.* ¶¶102, 118. In 2019, Robinhood raised $323 million in funding at a $7.6 billion valuation. *Id.* ¶119. As of August 2020, after raising $200 million, Robinhood was valued at $11.2 billion. *Id.*

4.    ***As a Stockbroker, Robinhood Is Subject to Industry Standards of Care, and Its Tactics Have Been the Subject of Regulatory Scrutiny and Record-Setting Fines.***

Robinhood entities and employees, as stockbrokers, are licensed by and subject to regulation and oversight from, numerous bodies, including the SEC, the Financial Industry Regulatory Authority ("FINRA"), and the National Securities Clearing Corporation ("NSCC"), the central counterparty that clears cash transactions in the U.S. equities markets and a subsidiary of the Depository Trust and Clearing Corporation ("DTCC"). *Id.* ¶¶152-53, 167. To maintain NSCC membership, Robinhood must abide by certain risk-mitigation obligations, including maintaining requisite levels of capital, cash deposits, and collateral. *Id.* ¶155. These requirements are calibrated to, and fluctuate with, the volume and volatility of trading within Robinhood's brokerage. *Id.* ¶¶156-59. Failure to meet DTCC deposit

requirements can result in sanctions, including loss of membership and failure of the brokerage.  *Id.* ¶155.

Robinhood is also subject to FINRA's rules, which seek to protect investors and markets.  For example, FINRA Rule 2010 states that "in the conduct of its business, [a brokerage] shall observe high standards of commercial honor and just and equitable principles of trade."  *Id.* ¶168.  FINRA Rule 3110 requires that brokerages maintain supervisory systems to monitor credit and other systemic risks, and FINRA Rule 4370 requires brokerages to "engage in continual risk management to ensure continuation of its trading and financial 'mission critical systems.'"  *Id.* ¶169.  FINRA's "Best Execution" requirement, Rule 5310, also requires stockbrokers to "maintain strong procedures, thoughtfully crafted in advance, to reasonably ensure that they can continue to provide investors access to the securities markets during times of extreme market volatility."  *Id.* ¶175 (quoting Regulatory Notice 21-12).

In its public SEC filings, Robinhood professes adherence to its duties and obligations as a stockbroker: "We understand that millions of our customers are using Robinhood to enter the financial markets for the first time, and we take our responsibility to them seriously."  *Id.* ¶122.  This understanding, however, has not translated to prudent behavior, and Robinhood has been subject to repeated regulatory scrutiny and discipline.  For example:

- In 2019, FINRA fined Robinhood after a review of trades between 2016 and 2017 revealed that Robinhood failed to provide the best market for its clients' trades, review certain order types, and establish and maintain a supervisory system. *Id.* ¶¶148-49.

- In December 2020, the SEC charged Robinhood Financial with willfully misleading clients about Robinhood's revenue sources and failing to execute trades in a manner most advantageous to clients. *Id.* ¶138. Robinhood Financial paid $65 million to resolve the charges. *Id.* ¶139.

- In June 2021, in response to the events underlying this lawsuit, FINRA levied against Robinhood its largest-ever fine—$70 million—for "systemic supervisory failures and significant harm suffered by millions of" clients, and stated that the amount of the fine "reflect[ed] the scope and seriousness of the violations." *Id.* ¶¶146-47, 272.

### B.    The January 2021 Short Squeeze

In late 2020 and January 2021, certain hedge funds and market makers were shorting stocks—i.e., betting on the downfall—of several companies. *Id.* ¶184.[2] A segment of individual investors disagreed with the wisdom of these short bets and

---

[2] A "short" is a bet the stock price will fall, accomplished by borrowing the stock from a lender, selling it at a high price, and buying the stock at a lower price when the time comes to return the stock to the lender. If successful, the short trader pockets the price differential. If the stock price increases, the short trader suffers (potentially uncapped) losses. *Id.* ¶106 n.8.

began purchasing these stocks and staking out long positions. *Id.* ¶183. Tens of thousands of Robinhood clients purchased these stocks, such that a majority of the trading for them took place through Robinhood's brokerage. *Id.* ¶3. The surge of individual investment caused the stocks' prices to rise. *Id.* ¶185. For example, GameStop's (GME) stock price increased by 78.46% between January 21 and January 25, 2021. *Id.* ¶185. Accordingly, hedge funds that shorted these stocks began amassing losses and had to either repurchase the stocks at a higher cost and close out their positions or post additional capital to guarantee the short. These repurchases further increased prices and created even greater losses for remaining shorts. *Id.* ¶¶187-88. This resulted in a "short squeeze." And the hedge funds felt quite a squeeze. Melvin Capital, for example, required a $3 billion infusion to cover its shorts. *Id.* The main source of that infusion? Citadel, Robinhood's leading revenue source. *Id.* ¶187.

Throughout this period, Robinhood continued its aggressive marketing and encouragement of risky and high-volume trading. *Id.* ¶¶4-6, 186-87. Substantial trading activity in the shorted stocks, largely through Robinhood, continued through January 27, 2021. *Id.* ¶191. Indeed, on that day, rather than pause the ability for new clients to join the brokerage, Robinhood "broke records for its highest number of daily active users on mobile at 2.6 million" and "had its best day ever in terms of single-day downloads" of its app. *Id.* ¶203. GameStop's stock peaked at $380.00

12

per share, ultimately closing at $347.51, a 134.84% increase from the previous day. *Id.* ¶191. Other stocks experienced similar increases, including AMC, which increased by 300%. *Id.* The individual investors who took positions against the short—Robinhood's clients and others—had thus amassed huge gains from their investments. *Id.* ¶189.

Robinhood knew that the trading volume it was fueling created risk for its brokerage. For example, on January 23, Robinhood circulated the following internal warning:

> Hey team! … I want to make sure we're all on the same page about the risk monitoring process we have in place and controls for reacting quickly to the market for situations such as this GME rally which has some other brokers potentially overreacting to the short covering happening in this stock. This reaction by other brokers could be driven from limiting their exposure on short sells rather than long margin exposure.

*Id.* ¶193. These discussions, including about "our risk exposure," involved Robinhood's highest-level executives. *Id.* ¶194. While most Robinhood executives were focused solely on the *company's* risk, one Robinhood employee flagged the *client* risk:

> It seems that the process outlined above covers firm risk well, but … we may want to consider the risks our customers face. Is there a comms need or other action we should consider that would provide protection to our customers?

*Id.* ¶195. Incredibly, however, this same employee hedged his warning because, in his opinion, the stockbroker did not have a "straightforward obligation" to its

13

"relatively inexperienced" but "self directed" clients. *Id.* This statement contradicted Robinhood's SEC filings, which state that Robinhood "take[s] our responsibility to [novice clients] seriously." *Id.* ¶122.

On January 25, 2021, in internal communications that included Robinhood Markets CEO Tenev, Robinhood's Director of Engineering wrote: "Maybe I am being alarmist but I think we should consider [an] all-hands on deck kind of situation and shuffle some priorities to deal with increasing volumes." Robinhood's Head of Data Science responded: "you may not be being an alarmist." *Id.* ¶198. After viewing a chart showing dramatic share-price increase, Tenev and the executives further conversed:

> [Head of Data Science]: [T]his success of GME short squeeze and people knowing more about other short squeezes … may lead to a ton of volume in the next few weeks.
>
> [Software Engineer]: [T]oday was a huge day. There are internal things that are starting to buckle under pressure ….
>
> [VP of Engineering]: [Redacted] is planning to declare a code yellow.[3]
>
> Tenev: only the paranoid survive.
>
> [Head of Data Science]: haha … "one who panics first panics best."
>
> Tenev: joy.

*Id.* ¶¶198-99.

---

[3] According to a Robinhood employee, "code yellow" is "when there is an upcoming near-term significant business risk requiring work that should be [done] to mitigate that must be prioritized over anything else…." Compl. ¶200.

Later that day, Tenev and his senior team scrambled to devise a crisis-management plan, as they started to wonder whether Robinhood could handle its clients' trading and whether it could meet its attendant capital requirements:

> Tenev: One thing I am not clear about … is how close we are to redlining …
>
> …
>
> [Head of Data Science]: Today was a high volume day, but … [w]e should not rule out a bigger day than today this week.
>
> [Head of Data Science]: It may be worth looking into the playbooks for contingencies where we miss the deadlines....
>
> [Dir. of Engineering]: This clearing thing seems pretty scary to me.  I would say this is our biggest fire right now…. [T]he consequence of us submitting this file late to the OCC … is … a margin call of hundreds of millions of dollars, that we would need to meet in the a.m.  In the worst case scenario we max out our credit lines and they liquidate our positions.
>
> [Senior Engineering Manager]: "very readline" [*sic*] is right.
>
> [Dir. of Engineering]: The number of events … to process is growing almost 2x week over week…. This file *must* be submitted on time.... If the number of events grow another 50% or above next week, we will certainly be late and I think this is very likely to happen.  Marketing is ramping up, superbowl ads is coming up, crypto volatility/speculation on [R]eddit seems to be increasing.

*Id.* ¶201.

As these communications show, and contrary to regulatory requirements and industry standards, Robinhood did not have systems in place (1) to handle the trading

volume among its clients or (2) to mitigate risk from market volatility. *Id.* ¶204. And yet Robinhood continued "ramping up" its marketing, accepting new clients, facilitating volatile trading, and moving ever closer to its financial breaking point.

### C.    The $3 Billion Capital Call and Trading Shutdown

Robinhood Securities receives NSCC margin statements reflecting Robinhood's capital surplus or deficit so that the brokerage can monitor its capital requirements in real time and manage risk. Compl. ¶157. On the morning of January 25, 2021, Robinhood Securities had an $11,397,650.77 surplus; hours later, it had a $74,428,708.17 deficit. *Id.* ¶¶208-09. The next morning, Robinhood had an $84,930,423.58 deficit, followed by an $11,348,423.58 surplus the next day, January 27. *Id.* ¶¶210-11. That afternoon, DTCC notified Robinhood Securities that "due to the volatility in the market, NSCC may be making intraday calls for additional clearing fund[s], as needed...." *Id.* ¶212.

Hours later, Robinhood learned it had a deficit of $407,770,190.70. *Id.* ¶213. At 10:32 p.m. EST, Robinhood sent an internal email stating that "RHS needs to borrow $300mil from the parent to cover the cash deficit mainly driven by NSCC and OCC intraday clearing deposits." *Id.* ¶214. At 5:11 a.m. EST on January 28, 2021, Robinhood received notice that it had a deposit deficit exceeding $3 billion and had to cover the deficit by 10:00 a.m. EST. *Id.* ¶215.

Despite its FINRA obligations to maintain a supervisory system and engage in "continual risk management," and despite its recognition that the very trading volume Robinhood was actively promoting was creating "redline" level risk, Robinhood had not taken *any* steps to acquire sufficient capital to back the growth of its brokerage. As of the morning of January 28, 2021, Robinhood had only $1,290,819,421.15 in the bank and a daily wire limit of $1 billion. *Id.* ¶221. Indeed, Robinhood was so unprepared to address its collateral deficit that it did not even know whom to contact at NSCC to discuss its shortfall. *Id.* ¶217.

Far from seeking to mitigate risk to protect its clients, Robinhood declared internally: "We aren't paying 3B worth." *Id.* ¶15. Shortly after 9:00 a.m. EST, however, Robinhood received a life preserver: NSCC waived the premium charge, and the net deposit requirement decreased to $1.4 billion. *Id.* ¶223. But that only exposed the depth of Robinhood's lack of preparedness, and Robinhood doubled down: "We don't have that either." *Id.* ¶224. Before the market opened, Robinhood received yet another dispensation, with NSCC reducing Robinhood's deficit to $733,976,926.71. *Id.* ¶225. Robinhood met this requirement at around 9:00 a.m. *Id.* ¶235.

But Robinhood had had enough. Rather than continuing to execute the high-volume trading it had eagerly encouraged among its clients, sometime between 6:30 and 7:30 a.m. on January 28, 2022, Robinhood shut down trading within its

brokerage for thirteen stocks ("Suspended Stocks"). *Id.* ¶235. Specifically, in what is believed to be the only such occurrence in the long history of U.S. securities trading, Robinhood halted only one side of the trade, the buy-side, moving the Suspended Stocks to "Position Closing Only" or "PCO." *Id.* ¶¶3, 7, 219, 238. No other conventional broker-dealer imposed a long-term, one-sided halt on trading in response to the January 2021 short squeeze. *Id.* ¶252. For example, neither Charles Schwab nor TD Ameritrade halted buying or selling of any stocks or basic options during the period of Robinhood's buy-side restrictions. *Id.* ¶253.

Robinhood also canceled purchase orders that clients had already lodged for these Suspended Stocks and even blocked users from accessing certain information about the Suspended Stocks. *Id.* ¶¶243-45. For more than a week, Robinhood kept in place some form of buy-side restrictions. *Id.* ¶¶16, 261-62, 266.

Robinhood's abrupt cancellation of a large segment of market demand predictably caused prices to plummet, wiping out more than ***$10 billion*** in value among the Suspended Stocks. *Id.* ¶¶2-3, 263-64. Although Robinhood claimed to its clients and Congress that it implemented the trading shutdown to meet regulatory requirements, no regulator required (or even suggested) this action. The decision was entirely Robinhood's. *Id.* ¶¶236-37, 239, 265. Indeed, in an internal message on January 28, 2021, Robinhood's own Chief Operating Officer boasted that the brokerage was "to[o] big for them to shut us down." *Id.* ¶6. Robinhood knew it

could weather the regulatory problem it had created, but it instead chose trading restrictions that harmed its own clients to avoid compliance costs, saving itself from increased capital requirements and saving the short bets of institutional investors. *Id.* ¶¶235-37, 250-51.  Robinhood knowingly did this against the best interest of its clients.  As CEO Tenev publicly admitted: "We knew this was a bad outcome for customers."  *Id.* ¶¶250-51.

## II.    COURSE OF PROCEEDINGS BELOW

Those harmed by Robinhood's actions have filed scores of lawsuits.  Many of those suits have been consolidated for pre-trial purposes in a multi-district litigation, *In re January 2021 Short Squeeze Trading Litigation*, in the United States District Court for the Southern District of Florida.  The MDL is divided into "tranches" of claims proceeding separately.  At issue here are the state-law claims asserted against the Robinhood entities, which have been consolidated into one master class-action complaint.

The Amended Consolidated Class Action Complaint ("Complaint") brought seven common law causes of action under state law: (1) negligence, (2) gross negligence, (3) breach of fiduciary duty, (4) breach of the implied duty of care, (5) breach of the implied covenant of good faith and fair dealing, (6) tortious interference, and (7) civil conspiracy.  Plaintiffs allege two subclasses of persons harmed by Robinhood's misconduct: (1) the "Nationwide Investor Class" of persons

who (a) held the Suspended Stocks at the time of Robinhood's trading restrictions and (b) sold those securities before February 23, 2021; (2) the "Robinhood Class" of Robinhood's clients whose trading (or attempted trading) in the Suspended Stocks was negatively affected by the trading restrictions. Compl. ¶273.

On January 27, 2022, the district court granted Robinhood's motion to dismiss the Complaint, dismissing all claims with prejudice. App. 535-600 ("Order"). Plaintiffs appeal that dismissal.

## III.  STANDARD OF REVIEW

A district court's dismissal under Rule 12(b)(6) is reviewed *de novo*, as are underlying questions of state law. *See Godelia v. Doe 1*, 881 F.3d 1309, 1316 (11th Cir. 2018).

## SUMMARY OF ARGUMENT

The district court held that Robinhood is immunized from liability under state law. That conclusion is wrong under Florida law (which should apply to the tort claims) and California law. First, as a stockbroker, Robinhood owes fiduciary duties to its clients, including a duty not to elevate self-interest over client interests. Robinhood's purported status as a non-discretionary broker does not absolve it of its fiduciary duties—and, in any event, Robinhood cannot hide behind the non-discretionary shield while also wielding the sword of a contract clause that

supposedly grants unfettered discretion over client accounts.  Second, Robinhood

undertook to provide brokerage services and had a consequent duty to do so with

due care—including by ensuring it met industry standards for managing market

volatility.  The economic nature of the losses arising from Robinhood's negligence

does not bar recovery.  Third, Robinhood is liable under California law for breaching

the implied covenant of good faith and fair dealing, as well as the implied duty of

care.  The Agreement's discretion clause does not vitiate these covenants; rather, the

discretion must be exercised in good faith and with due care.  Fourth, the district

court erred in dismissing the tortious-interference claim based on the assumption

that no breach of the implied covenants occurred.

## ARGUMENT

### I.    PLAINTIFFS STATE VIABLE TORT CLAIMS UNDER THE LAWS OF BOTH FLORIDA AND CALIFORNIA, BUT TO THE EXTENT A CONFLICT EXISTS, FLORIDA LAW APPLIES.

Plaintiffs contend that Florida law applies to their tort claims, while

Robinhood contends California law applies.[4]  The district court correctly held that

Florida's choice-of-law rules apply and that a choice between substantive law need

not be made if application of either would "produce the same outcome."  App. 554.

The district court held that Florida and California law produce the same outcome.

---

[4] The parties agree that California law applies to Plaintiffs' contract claims
(Counts IV and V).  App. 553.

Appellants agree that the outcome is the same, but for a different reason: all the tort claims *are* viable under both states' law, as explained below.  If, however, this Court determines there is a difference in outcomes, then Florida law must apply.

"Florida utilizes the 'most significant relationship' test to determine which state's laws applies to tort claims."  *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1301 (11th Cir. 2003).  Robinhood's failure to maintain adequate capital and its decision to restrict trading are central to Plaintiffs' tort claims, and those actions flowed through Robinhood Securities, which is headquartered in Florida.  Compl. ¶¶28, 91, 100, 235.  Indeed, the MDL was consolidated in Florida precisely because "some of the events central to this litigation—in particular, Robinhood Securities' decision to restrict trading … took place in Florida."  App. 105.  No state has a closer relationship to these events than Florida.

Below, Robinhood did not dispute that Florida has the closest relationship to this case, but instead argued that the Agreement's choice-of-law provision requires application of California law to the tort claims.  App. 402-03. But that provision governs only two issues: (1) "[t]his Agreement" and (2) "all transactions made in My Account."  Agrmt. §37.K.  Robinhood conceded that Plaintiffs' tort claims do not fall into the first bucket, arguing the claims can be shoehorned into the second. App. 507-08.  Yet the crux of Plaintiffs' tort claims is that desired transactions were

*not* made due to Robinhood's tortious conduct. Robinhood wants "transactions made" to mean "any and all disputes arising from," but the clause simply does not say that, despite such a phrase being common in choice-of-law provisions. *See, e.g.*, *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1162 (11th Cir. 2009) (construing choice-of-law provision governing "all disputes arising out of or in connection with" the agreement). Accordingly, the Agreement's narrow choice-of-law provision does not govern Plaintiffs' tort claims.

## II. THE DISTRICT COURT ERRED IN DISMISSING THE FIDUCIARY-DUTY CLAIM (COUNT III).

### A. The Complaint Adequately Alleged that Robinhood Owed Plaintiffs Fiduciary Duties and Breached those Duties.

Robinhood Financial and Robinhood Securities are stockbrokers. The Agreement explains that these companies "open[] … accounts on [a client's] behalf … for the purchase, sale or carrying of securities or contracts relating thereto." Agrmt. at 1. And Robinhood's Relationship Summary, incorporated into the Agreement, tells clients that Robinhood Financial is registered with the SEC as "broker-dealer" and "offers brokerage services to retail investors." Compl. ¶¶318-19, Ex. B at 1. Robinhood Securities "services [the client's] account by executing, clearing and settling [the client's] trades." *Id.*

The common law has long recognized the fiduciary nature of the stockbroker-client relationship. *See, e.g.*, *Gallagher v. Jones*, 129 U.S. 193, 201 (1889)

(recognizing that a "trust relation exists … between a stock-broker and his client"); *Kennedy v. Budd*, 5 A.D. 140, 144, (N.Y. App. Div. 1896) ("[A] trust relation is the one which is deemed to exist between a stockbroker and his client."). The concept is so ingrained in American jurisprudence that it is included in the dictionary definition of "fiduciary relationship." *See Fiduciary Relationship*, Black's Law Dictionary (11th ed. 2019) ("a specific relationship that has traditionally been recognized as involving fiduciary duties" is between "a stockbroker and a customer").

Both Florida and California adhere to the traditional definition. In Florida, "a stockbroker must deal with its clients in good faith and owes them a fiduciary duty of loyalty and care." *Ward v. Atlantic Sec. Bank*, 777 So.2d 1144, 1147 (Fla. 3d DCA 2001). In California, "the relationship between a stockbroker and his or her customer is fiduciary in nature." *Duffy v. Cavalier*, 264 Cal.Rptr. 740, 751 (Cal. Ct. App. 1989).

This Court has explained "[t]he law is clear that a broker owes a fiduciary duty of care and loyalty to a securities investor," and thus has, inter alia, (1) "the duty to refrain from self-dealing," (2) "the duty to perform the customer's orders promptly in a manner best suited to serve the customer's interests," and (3) "the duty not to misrepresent any material fact to the transaction." *Gochnauer v. A.G. Edwards & Sons, Inc.* 810 F.2d 1042, 1049 (11th Cir. 1987) (approving and adopting

the "detailed analysis of numerous cases" found in *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F.Supp. 951, 953 (E.D. Mich. 1978)).  The Complaint adequately alleges that Robinhood violated each of these duties.  Compl. ¶¶304-07.

First, regarding the most fundamental duty of a fiduciary—to avoid elevating self-interest over client interests—the Complaint alleges "Robinhood Securities and Robinhood Financial … act[ed] in their own self-interest and contrary to the interest of their customers, suspending trading to benefit themselves at the expense of Plaintiffs and the Robinhood Class."  Compl. ¶306.  Robinhood's internal communications show that the trading freeze not only had the effect of elevating the company's interest over client interests, *but was designed to do so*.  *See id.* ¶200 (internal communication stating Robinhood's "business risk … must be prioritized over anything else"), ¶201 (internal communication expressing concern about "blowback" to the "brand" and the "long term [e]ffects" on company), ¶219 (internal communication stating refusal to meet clearing-fund requirements necessitated by client trading).  As Robinhood CEO Tenev flatly admitted, Robinhood prohibited trading "to protect the firm" even though it "knew this was a bad outcome for customers."  *Id.* ¶¶250-51.

Second, the Complaint alleges Robinhood breached its duty to "provide an open trading platform free of self-imposed trading restrictions" and "to carry out orders promptly in a manner best suited to serve the customers' interests."  *Id.* ¶304.

25

The Complaint explains how Robinhood ignored client orders, or blocked the ability to place orders, by prohibiting buy-side trading.  *See id.* ¶¶3, 240-41, 243, 247-48. For example, on January 28, 2021, Plaintiff Moody received a message from Robinhood that her orders for NAKD and NOK had "been cancelled" even though she never cancelled them.  *Id.* ¶244.

Third, the Complaint alleges Robinhood violated its fiduciary duty of good faith and honesty.  *Id.* ¶¶304, 307.  Robinhood knew it was approaching a "redline" situation but failed to disclose it.  *Id.* ¶201.  Further, Robinhood falsely told clients the trading restrictions were due to "market volatility," *id.* ¶¶235, 249, 265, while internally (and later externally) the brokerage admitted it imposed restrictions to serve its own self-interest, *id.* ¶¶200-01, 219, 235, 250-51.  Finally, Robinhood lied to clients about why transaction functionality had been removed.  *Id.* ¶¶241-42.

These straightforward allegations—that Robinhood violated a stockbroker's core fiduciary duties—amply satisfy Plaintiffs' pleading burden to "'raise a right to relief above'" mere speculation. *See Worthy v. City of Phenix City, Ala.*, 930 F.3d 1206, 1217 (11th Cir. 2019) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

**B.    The District Court Erred in Concluding Robinhood May Intentionally Harm Its Clients with Impunity.**

Despite the Complaint's adequate allegations, the district court dismissed Count III, finding that, as a matter of law, Robinhood has *no* fiduciary duties to its clients.  That is wrong under both Florida and California law.

First, the district court held that "self-directed brokerages—like Robinhood, E*Trade, TD Ameritrade, and Charles Schwab"—do not have "general fiduciary duties."  App. 576.  That conclusion—that the merger of Big Tech with traditional brokerage services vitiates the fiduciary relationship—has no foundation in law.  Indeed, it is contrary to the district court's holding just last year that a complaint *did* allege a "fiduciary relationship" between Robinhood and its clients.  *See Pinchasov v. Robinhood Financial, LLC*, 2021 WL 4991144, at *4 (S.D. Fla. April 22, 2021) (Altonaga, J.).

The controlling Florida case, *Ward*, involved a "***non-discretionary*** account whereby Stockholder maintained the authority to decide whether to buy, sell, or retain his shares."   777 So.2d at 1145 (emphasis added).   *Ward* nonetheless announced such a stockbroker "must deal with its clients in good faith and owes them a fiduciary duty of loyalty and care."  *Id.* at 1147.  Such good faith, loyalty, and care includes a "duty to perform the customers' orders promptly in a manner best suited to serve the customer's interests," and "the duty not to misrepresent any material fact to the transaction."  *Id.*  Accordingly, this Court, applying Florida law,

27

has explained that the "law is clear that a broker owes a fiduciary duty of care and loyalty to a securities investor" if employed to "***make***, manage, ***or*** advise on investments." *Gochnauer*, 810 F.2d at 1049 (emphasis added). Brokers employed to "make … investments" have the duties of care and loyalty within the scope of their agency, even if that agency does not include "advis[ing]" on investments. That is why *Gochnauer* said "or" and not "and" in listing the broker activities falling within the fiduciary relationship. *See First Union Brokerage v. Milos*, 717 F. Supp. 1519, 1526 n.22 (S.D. Fla. 1989) (citing *Gochnauer* and rejecting, as "contrary to the law of this circuit," the contention that "where the account is nondiscretionary, no fiduciary duties arise"). The fact that brokerages—like all modern commerce— have moved online and to smartphones does not immunize them from the law governing the broker-client relationship. *Cf. McGillis v. Dep't of Econ. Opportunity*, 210 So. 3d 220, 223 (Fla. 3d DCA 2017) ("multi-faceted product of new technology" found in ride-sharing apps does not alter application of traditional law of agency); *NetChoice, LLC v. Attorney Gen.*, 34 F.4th 1196, 1203 (11th Cir. 2022) ("basic principles … do not vary when a new and different medium for communication appears").

The district court cited *SFM Holdings, Ltd. v. Banc of America Securities, LLC*, 600 F.3d 1334, 1339-40 (11th Cir. 2010), for the proposition that brokers can

"limit the scope of their duties to customers by agreement." App. 579.[5]  That is true so far as it goes.  Not every broker is an investment advisor, and thus brokers may limit their duties to exclude such services.  But in carrying out the *duties undertaken*, the broker must still act as a fiduciary.  *See Ward*, 777 So.2d at 1147.  Because "[t]he fiduciary concept derives from trust and agency principles," *First Union*, 717 F.Supp. at 1526 (citing *Gochnauer*, 810 F.2d at 1049), fiduciary duties apply to the scope of the agency.

Likewise, California law does not immunize non-discretionary brokers from fiduciary obligations.  Instead, "there is a fiduciary duty … in ***every*** broker-customer relationship," and the fact that a broker does "not have discretionary authority over the [client's] account[] may limit the scope of the fiduciary duty … but it does not eliminate that duty as a matter of law."  *In re Nuveen Funds/City of Alameda Sec. Litig.*, 2011 WL 1842819, at *24-25 (N.D. Cal. May 16, 2011) (emphasis added).  *See also Petro-Diamond Inc. v. SCB & Assocs., LLC*, 122 F.Supp.3d 949, 959 (C.D. Cal. 2015) ("California imposes a fiduciary duty on every broker-customer relationship," even though "*scope or extent*" can vary based on facts such as "the nature of the account, whether discretionary or nondiscretionary").  *Duffy* explained "[t]o the extent there is language in … any … federal case purporting to interpret California law as not imposing *any* fiduciary duty on a stockbroker unless he or she

---

[5] *SFM Holdings* did not cite any Florida state-court cases.

exercises continuing control over the customer's account or acts as an 'investment counselor,' we are in disagreement with the federal courts of appeals," and "[f]ederal decisions are … not controlling on matters of state law."  264 Cal.Rptr. at 752 n.10.

The district court relied on *Brown v. California Pension Administrators & Consultants, Inc.*, 52 Cal.Rptr.2d 788 (Cal. Ct. App. 1996), for the proposition that stockbrokers "do not owe general fiduciary duties to clients with non-discretionary accounts."  App. 574.  But *Brown* reaffirmed "the long-settled rule that a stockbroker owes a fiduciary duty to his or her customer," and merely explained that a non-discretionary broker does not have "a duty to notify the customer of the risky nature of an investment."  52 Cal.Rptr.2d at 796-97.  *Brown* did not hold that non-discretionary brokers can act dishonestly or in a self-dealing manner.  So, too, with *Petersen v. Securities Settlement Corp.*, 277 Cal.Rptr. 468 (Cal. Ct. App. 1991), the other case relied on below.  There, the court simply held that the investment-disclosure duties for discretionary brokers are not part of the fiduciary duties for non-discretionary brokers.  *Id.* at 474.

Second, as to specific fiduciary duties, the district court truncated the Complaint's allegations, focusing only on "Plaintiffs' allegation that Robinhood Financial owed them a duty 'to provide an open trading platform free of self-imposed trading restrictions.'"  App. 575 (quoting Compl. ¶304).  But Paragraph 304 alleges that Robinhood has fiduciary duties other than keeping trading open:

30

> Robinhood … owed fiduciary duties of care, good faith, honesty, and loyalty, … which include, without limitation, the duty to provide an open trading platform free of self-imposed trading restrictions, the duty to carry out orders promptly in a manner best suited to serve the customer's interests, the duty to transact business only after receiving prior authorization from the customer, the duty to use reasonable efforts to provide customers information relevant to the affairs entrusted to it, and the duty not to act out of a conflict of interest, nor to prefer the fiduciary's self-interest over that of its customers.

The district court thus failed to analyze whether the Complaint stated a claim for breach of fiduciary duties other than providing the open trading platform promised in the Agreement. As explained above, the allegations track the duties enshrined in common law, outlined by this Court in *Gochnauer*, and routinely recognized by Florida and California courts. They are thus sufficient to state a claim.

Third, even as to the duty to "keep trading open," the district court erred. The court reasoned that "Robinhood Financial had no duty" because "Plaintiffs expressly agreed that Robinhood Financial could prohibit trading on the Robinhood platform." App. 575 (citing Agrmt. §5F) ("Robinhood may at any time, in its sole discretion and without prior notice to Me, prohibit or restrict My ability to trade securities."). But nothing in the Agreement says Robinhood can use "its sole discretion" to elevate its self-interest over the client's interest, or that Robinhood would not honor its common law duties of loyalty and good faith in exercising its discretion. It does not say such discretion is "absolute" or can be exercised "for any reason or no reason whatsoever." *See United States v. Dish Network, L.L.C.*, 954 F.3d 970, 975 (7th Cir.

2020) (contract clause reserving action "in its sole and absolute discretion for any reason or no reason"); *Tamrazian v. UNUM Life Ins. Co. of Am.*, 2020 WL 4288441, at *2 (C.D. Cal. Apr. 14, 2020) (same).  Rather, the Agreement guarantees Robinhood is the client's "agent for purposes of carrying out [the client's] directions," will take "such … steps as are ***reasonable*** to carry out [the client's] directions," and will not "make discretionary trades."  Agrmt. §§4, 5A (emphasis added).  Additionally, the Agreement states that "[a]ll transactions in My Account will be subject to … the applicable laws and regulations of any state or jurisdiction in which Robinhood Financial is registered" and "the rules of any applicable self-regulatory organization of which Robinhood Financial is a member" (e.g., FINRA). *Id.* §11.  State law and FINRA rules do not permit stockbrokers to ignore their clients' best interest (or promote their own interests) in the exercise of discretion. Fairly read as a whole, the Agreement cannot be interpreted to mean what Robinhood says—namely, that it can simply freeze client purchases, at any time and forever, for its own profit or that of hedge funds it deems more important than retail clients.

Moreover, if Section 5F truly vests Robinhood with unlimited "discretion" to decide whether to execute a client's trades, then Robinhood is not a *nondiscretionary* broker.  It instead provides completely discretionary brokerage services.  And if that is true, then the district court's other rationale for dismissing Count III—that

32

nondiscretionary brokers have no fiduciary duties—falls away. *See* App. 580 (finding inapplicable "cases involving brokers who intervene in clients' investment decisions"). Robinhood cannot have it both ways: it either had a nondiscretionary duty to execute client trade orders reasonably and in good faith, or it had total discretion over client accounts, in which case it had *all* of the general and exacting duties of a discretionary broker.

Fourth, the district court erred by failing to consider how the particular contours of the alleged broker-client relationship underscore Robinhood's fiduciary duties. *See Ward*, 777 So.2d at 1147; *Duffy*, 264 Cal.Rptr. at 752. Robinhood consistently boasts the inexperience of its clientele, *see, e.g.*, Compl. ¶¶108-09, 111, 121-23, 303, and purports to take "seriously" its "responsibility" to those "millions of customers [who] are using Robinhood to enter financial markets for the first time," *id.* ¶122. From its declared mission "to democratize finance for all" by "giv[ing] everyone—not just the wealthy—access to financial markets," to its user interface designed "for a generation of mobile-first customers," to its "gamification" features aimed at increasing trading activity among novice investors, Robinhood targets the least-experienced and least-sophisticated investors. *Id.* ¶¶108, 128-29. The "actual financial situation and needs" of Robinhood's novice clients are clear; they need Robinhood to execute their trades as directed and without obfuscation or

33

self-dealing. *Petro-Diamond Inc.*, 122 F.Supp.3d at 959. By ignoring those needs for its own benefit, Robinhood breached its fiduciary duties.

Fifth, the district court wrongly held that Robinhood Securities, as a clearing broker, "does not generally owe fiduciary duties to investors whose transactions it executes." App. 580-81. For Florida law, the court cited *SFM Holdings*, but that case recognized that clearing brokers *do* have the "duty of executing stock orders," and that the clearing broker there "performed to the extent of the agency created" in the agreement. 600 F.3d at 1340 (citing *Limbaugh v. Merrill, Lynch, Pierce, Fenner & Smith*, 732 F.2d 859, 862 (11th Cir. 1984)).[6] Here, one of the very things complained of is Robinhood's failure to exercise care and diligence in taking and executing client orders.

For California law, the court cited *Petersen*, but that case stated only that certain "disclosure standard[s]" related to "a broker's recommendation" "do not arise" where the "relationship is confined to the simple performance of transactions." 277 Cal.Rptr. at 472-73. A clearing broker must still perform the agreed-upon transactions with due care and loyalty. *Duffy*, 264 Cal.Rptr. at 752. Indeed, *Petersen*

---

[6] *Limbaugh* applied Alabama law but this Court appears to have cited it approvingly in the Florida case. *Limbaugh*, in turn, approvingly cites section 381 of the Second Restatement of Agency for the proposition that an agent has a "duty to use reasonable efforts to give the principal information relevant *to the affairs entrusted to it*." 732 F.2d at 862 (emphasis added).

even recognized that, under certain circumstances, a clearing broker's fiduciary duties might extend further.  277 Cal.Rptr. at 474.

## III.   THE DISTRICT COURT ERRED IN DISMISSING THE NEGLIGENCE CLAIMS (COUNTS I & II).

The elements of a negligence claim are duty, breach, proximate cause, and actual loss.  *See Jackson Hewitt, Inc. v. Kaman*, 100 So.3d 19, 27-28 (Fla. 2011); *Brown v. USA Taekwondo*, 483 P.3d 159, 164 (Cal. 2021).  The latter three elements are questions of fact, while the duty element is a question of law.  *Jackson Hewitt*, 100 So.3d at 28; *Bily v. Arthur Young & Co.*, 834 P.2d 745, 761 (Cal. 1992).[7]

Here, the Complaint alleges that Robinhood—by providing brokerage services—had a duty to execute this undertaking with reasonable care, skill, and ability.  Compl. ¶¶283-84.  Thus, Robinhood had a duty to ensure that its platform was equipped to deliver trading services during reasonably foreseeable increases in demand, and to exercise reasonable care in safeguarding client investments by maintaining adequate capital to comply with regulatory requirements triggered by the trading volume it intentionally encouraged.  *Id.* ¶¶285-291, 294-300.

The district court held that, as a matter of law, Robinhood has ***no*** duty to carry on its undertaking in a non-negligent manner.  In other words, the court held that

---

[7] Robinhood did not argue below, and thus cannot argue here, that the Complaint fails to adequately allege (1) breach, causation, and harm, or (2) the extreme breach of the standard of care for gross negligence (Count II).  App. 404-13.

Robinhood is free to act as recklessly as it wants, with no possible consequences in negligence law for any economic harm, regardless of circumstances. That extreme conclusion is wrong under both Florida and California law.

### A.   The Complaint States Claims for Negligence Under Florida Law.

To state a claim for negligence under Florida law, the Complaint must allege facts showing that Robinhood had a duty "to conform to a certain standard of conduct, for protection of others against unreasonable risks." *Clay Elec. Co-op v. Johnson*, 873 So. 2d 1182, 1186 (Fla. 2003). "Florida … recognizes that a legal duty will arise whenever a human endeavor creates a generalized and foreseeable risk of harming others…. [T]he law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from harm that the risk poses." *McCain v. Florida Power Corp.*, 593 So.2d 500, 503 (Fla. 1992). The source of a legal duty can be, inter alia, (1) "judicial precedent," (2) "legislative enactments or administrat[ive] regulations," or (3) "the general facts of a case"—"i.e., … because of a foreseeable zone of risk arising from the acts of the defendant." *Id.* at 503 n.2. When the "source of the duty" is from statutes, regulations, or judicial precedent, "the factual inquiry necessary to establish a duty

is limited." *Limones v. School Dist. of Lee Cnty.*, 161 So.3d 384, 389 (Fla. 2015). The Complaint adequately alleges a duty arising from all three sources.

### 1.     *Florida Precedent Imposes Undertaker Duties on Robinhood.*

Florida courts have long held that "[w]henever one undertakes to provide a service to others, whether one does so gratuitously or by contract, the individual who undertakes to provide the service—i.e., the 'undertaker'—thereby assumes a duty to act carefully and to not put others at an undue risk of harm." *Clay Electric*, 873 So.2d at 1186. Courts have applied this well-established principle in many contexts. *See, e.g.*, *In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*, 2022 WL 1468057, at *24 (May 10, 2022) (companies that undertake collection of private data have "duty to protect that information"); *Great Lakes Ins., SE v. SARL JFL, FI*, 2021 WL 6134788, at *5 (S.D. Fla. Oct. 8, 2021) (insurance agents); *Kantrow v. Celebrity Cruises, Inc.*, 510 F.Supp.3d 1311, 1323 (S.D. Fla. 2020) (cruise operators); *In re Marjory Stoneman Douglas High Sch. Shooting FTCA Litig.*, 482 F. Supp. 3d 1273, 1292 (S.D. Fla. 2020) (government agency); *Christie v. Royal Caribbean Cruises, Ltd.*, 497 F.Supp.3d 1227, 1234-35 (S.D. Fla. 2020) (company that undertook coordination of emergency care); *Muchnick v. Goihman*, 245 So. 3d 978, 981 (Fla. 3d DCA 2018) (rental agent).

Here, all three Robinhood entities undertook to provide investors with self-clearing brokerage services. *See* Compl. ¶¶109-12. Robinhood especially sought to

facilitate high-volume trading of risky products by novice investors. Compl. ¶¶4-5, 114-15, 121, 124, 126, 129, 131-34, 186. Robinhood generally undertook to provide these services on a nondiscretionary basis, but also reserved to itself the right to exercise discretion to restrict trading—and it undertook to do these things in a "reasonable" manner and consistent with industry rules and standards. Agrmt. §§4, 11. Robinhood Financial and Robinhood Securities undertook to provide these services through the Agreement. Compl. ¶311. Robinhood Markets undertook to provide these services through its integration with, and direction of, its subsidiaries. *Id.* ¶¶86, 95-100. As undertakers of these services, all three entities created a zone of risk for (1) the clients to whom it provided these services, (ii) other investors in the securities for which Robinhood encouraged huge volume on its platform and then undertook market-altering trading restrictions. Robinhood thereby assumed a duty to carry out its undertakings "carefully and to not put others at an undue risk of harm." *Clay Elec. Co-Op.*, 873 So.2d at 1186.

The district court criticized Florida's undertaker doctrine as "seemingly limitless," App. 571, but the doctrine simply requires undertakers to act with reasonable care and fits comfortably within the facts of this case. Indeed, despite the district court's criticism, just last year the same court held that Florida's undertaker doctrine ***applies to Robinhood*** when it implements trading restrictions. In *Pinchasov v. Robinhood Financial, LLC*, 2021 WL 4991144 (S.D. Fla. Apr. 22,

2021) (Altonaga, J.), the plaintiffs sued Robinhood for implementing a "T1 Halt temporarily prevent[ing] a company's stock from being traded" and thereby "causing its customers to lose money." *Id.* at *1. Citing Florida's undertaker doctrine, the court held that "Plaintiff alleges a foreseeable risk—novice investors unknowingly placing trade orders on T1 Halted stocks and suffering from price volatility—which Defendant, as a securities broker-dealer, should have protected its customers against." *Id.* at *4 (quoting *Clay Elec.*, 873 So.2d at 1186). Accordingly, the court held that the complaint "adequately states a duty." *Id.* If undertaker liability was adequately alleged in *Pinchasov*—the underlying facts of which occurred in March 2020—it was adequately alleged here.

## 2.    *Statutes and Rules Imposed a Legal Duty on Robinhood.*

The Florida Supreme Court has adopted the Second Restatement's principle that statutes and rules can provide the standard of conduct for common-law negligence. *McCain*, 593 So.2d at 503 n.2 (citing Restatement (Second) of Torts §285 (1965). Section 285 of the Restatement provides illustrations of statutes that establish a standard of care, such as a "statute requiring vendors of certain products to subject them to certain tests," and a statute that "prohibits driving automobiles

within certain districts at a greater rate of speed than that named." Restatement (Second) of Torts §285 (1965) illus. 2 & 3.

Here, just like a vendor subject to testing requirements, Robinhood was required by FINRA Rules 3110, 4370, and 5310 to maintain a supervisory system to monitor risk and to "engage in continual risk management to ensure continuation of its trading and financial 'mission critical systems.'" Compl. ¶169.[8]  And just like a driver that faced a speed limit, Robinhood Securities had a duty, under the governing regulatory framework, to cover the volume of its brokerage services through cash deposits.  Compl. ¶¶152-66.  Robinhood Securities itself recognized:

> If we do not maintain the capital levels required by regulators and self-regulatory organizations ("SROs"), including the SEC and … FINRA[], or do not satisfy the cash deposit and collateral requirements imposed by certain other SROs such as the … DTC[], … NSCC[] … our broker-dealer business may be restricted and we may be fined or exposed to significant losses or subject to other disciplinary or corrective actions.

*Id.* ¶155.  These regulatory requirements thus establish an industry standard of care—one that Plaintiffs adequately allege Robinhood breached.  *See Remington v. Newbridge Sec. Corp.*, 2013 WL 2444719, at *6 (S.D. Fla. June 5, 2013) (stock broker's "failure to comply with [FINRA] rule[s] is evidence that the[] [broker]

---

[8] FINRA's rules have the force of law.  *See McDaniel v. Wells Fargo Invs., LLC*, 717 F.3d 668, 673 (9th Cir. 2013); *Luis v. RBC Cap. Markets, LLC*, 984 F.3d 575, 577 (8th Cir. 2020).

breached the[] duty of care, which includes a duty to act in accordance with the standard of care used by other professionals in the community"); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 697 F.Supp. 1224, 1227 (D.D.C. 1998); *Sideman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 465 F.Supp. 1233, 1236 (S.D.N.Y. 1979).

### 3.    *The Facts of the Case Impose a Legal Duty.*

The "statute books and case law … are not required to catalog and expressly proscribe every conceivable risk in order for it to give rise to a duty of care." *McCain*, 593 So.2d at 503.  Instead, a duty of care also exists when "the general facts of the case" show "a foreseeable zone of risk arising from the acts of the defendant." *Id.* at 503 n.2.  As "the risk grows greater, so does the duty, because the risk to be perceived defines the duty that must be undertaken."  *Id.* at 503.  Thus, "the proper inquiry" for the duty element of negligence is simply "whether the defendant's conduct created a foreseeable zone of risk."  *Id.* at 504.  In *McCain*, the court held that a company created a zone of foreseeable risk not only because the conduct at issue was inherently risky but also because the company demonstrated "it understood or should have understood the extent of the risk involved."  *Id.*

So, too, here.  Robinhood's business model was to entice novice investors to engage in high-volume trading of risky securities.  As trading intensified in certain stocks, Robinhood continued to encourage churn, even as it realized its ballooning

capital requirements were creating a "redline" situation.  Compl. ¶201.  Robinhood knew the risks inherent in failing to meet its capital requirements, *id.* ¶155, but persisted nonetheless.  Then, once it could persist no longer, it imposed the trading restrictions, which it knew created risk of harm for clients and holders of the Suspended Stocks.  As CEO Tenev publicly stated: Robinhood "knew this was a bad outcome for customers."  *Id.* ¶251.  These egregious facts are more than sufficient to allege a duty and breach under Florida law.

### 4.    *The Economic Loss Rule Is Not a Bar to Liability.*

The district court held that "Florida law generally does not obligate parties to avoid causing economic loss."  App. 568.  This conclusion is squarely contradicted by *Tiara Condominium Association, Inc. v. Marsh & McLennan Companies, Inc.*, 110 So.3d 399 (Fla. 2013).  *Tiara* explained that "the economic loss rule is a judicially created doctrine that sets forth ***the circumstances under which a tort action is prohibited if the only damages suffered are economic losses***."  *Id.* at 401 (emphasis added).  The court held that this doctrine "applies ***only*** in the products liability context" and "recede[d] from … prior rulings to the extent that they have applied the economic loss rule to cases other than products liability."  *Id.* at 407

42

(emphasis added).  Accordingly, the economic losses in this case are not a bar to tort liability under Florida law.

The district court disregarded *Tiara*, reasoning that "*Tiara* did not address the duty element of negligence claims," which is a "distinct" concept that "precludes most negligence claims predicated on economic harm alone."  App. 569-70.  But this flatly contradicts *Tiara*, which described the economic loss rule in terms of duty. *See* 110 So.3d at 404 (describing Florida's "seminal case on the applicability of the economic loss rule" as "holding … that 'a manufacturer in a commercial relationship has ***no duty*** under either a negligence or strict products liability theory to prevent a product from injuring itself'") (quoting *Florida Power & Light Co. v. Westinghouse Elec. Corp.*, 510 So.2d 899, 901 (Fla. 1987)) (emphasis added).  Moreover, the only Florida source that the Order cites for this supposed distinction is a non-precedential concurrence issued seven years before *Tiara*—in a case *Tiara* expressly overruled. *Compare* App. 570 (citing *Indem. Ins. Co. of N. Am. v. American Aviation, Inc.*, 891 So.2d 532, 546 (Fla. 2004) (Cantero, J., concurring)), *with Tiara*, 110 So.3d at 406-07 (describing *American Aviation* as part of the "legacy of unprincipled expansion" of the economic loss rule that "[w]e thus recede from").  In short, *Tiara* is clear, controlling precedent that delineates the limited "circumstances under which a tort action is prohibited if the only damages suffered are economic losses," and the Order

below cites no intervening Florida Supreme Court precedent undermining this holding.  110 So.3d at 401.[9]

The district court also cited an intermediate appellate decision, *Tank Tech, Inc. v. Valley Tank Testing. L.L.C.*, 244 So.3d 383 (Fla. 2d DCA 2018).  App. 570. But reliance on *Tank Tech* is misplaced.  First, *Tank Tech* relies on a 1999 intermediate appellate decision, *see* 244 So.3d at 393 (citing *Monroe v. Sarasota Cnty. Sch. Bd.*, 746 So.2d 530 (Fla. 2d DCA 1999)), and fails to mention the 2013 *Tiara* decision, which is intervening Florida Supreme Court authority.  *See Blue Cross Blue Shield of Ala., Inc. v. Nielsen*, 116 F.3d 1406, 1413 (11th Cir. 1997) ("The final arbiter of state law is the state supreme court….").  Second, *Tank Tech* held that economic harm *is* sufficient for a negligence claim where there is "some sort of link between the parties," such as "contractual privity."  244 So.3d at 393-94. Here, such contractual privity exists between Robinhood Financial/Securities and the Plaintiffs (and the proposed Robinhood class).  Third, *Tank Tech* held that economic harm is sufficient for a negligence claim where an "extraordinary circumstance … would require imposition of a duty."  *Id.* at 393.  The unprecedented

---

[9] The Order also cites the Third Restatement as "draw[ing] the same distinction" and "observing that Florida … distinguish[es] between the economic loss rule and the general lack of a duty to avoid causing economic harm."  App. 570 (citing Restatement (Third) of Torts: Liab. For Econ. Harm §3 & reporter's notes a and b (Am. L. Inst. 2020)).  But no Florida case has adopted this section of the Third Restatement and the only Florida case that the Restatement cites is *American Aviation,* which *Tiara* overruled.

trading restrictions imposed here—for the purpose of shifting economic loss from Robinhood to its clients—constitute just such a circumstance.

### B.    The Complaint States a Claim for Negligence under California Law.

To state a claim for negligence under California law, the Complaint must allege Robinhood had a duty to protect Plaintiffs "against [its] conduct." *Brown v. USA Taekwondo*, 483 P.3d 159, 213 (Cal. 2021). "A duty of care may arise through statute," by contract, or by operation of common law through an examination of "the general character of the activity in which the defendant engaged" or "the relationship between the parties." *J'Aire Corp. v. Gregory*, 598 P.2d 60, 62 (Cal. 1979). Plaintiffs' negligence claims are cognizable under several strands of California negligence law.

### 1.    *Robinhood Owes a Duty of Care.*

<u>First</u>, a "duty of care can … be grounded in—and hence 'borrowed' from— the public policy embodied in a legislatively enacted statute or ordinance." *Issakhani v. Shadow Glen Homeowners Assn., Inc.*, 278 Cal.Rptr. 3d 270, 279 (Cal. Ct. App. 2021) (citing *Vesely v. Sager*, 486 P.2d 151, 159 (Cal. 1971)). When a legislative enactment "implement[s] a broad, generally applicable rule of conduct on the basis of general public policy," it is "capable of forming the basis for a duty of care" in negligence actions. *Id*. at 280. FINRA rules establish the broad, generally applicable standards of conduct for broker-dealers and are meant to protect clients

45

like the Plaintiffs. *See supra* pages 10, 39-40. These rules establish a duty of care, and the Complaint adequately alleges that Robinhood violated this duty.

Second, in California, as in Florida, "a defendant who undertakes to render services to another may owe a duty of care either to the other person or to a third person." *Barenborg v. Sigma Alpha Epsilon Fraternity*, 244 Cal.Rptr. 3d 680, 692 (Cal. Ct. App. 2019). The scope of the duty "depends on the nature of the undertaking" and the defendant "must specifically have undertaken to perform the task that he is charged with having performed negligently." *Id*. Here, the Complaint adequately alleges that Robinhood (1) undertook to provide brokerage services to novice investors, and (2) failed to provide these services with due care, instead negligently encouraging trading volume without ensuring adequate capital reserves.

Third, California's negligence statute and common law create a "general rule" that "people owe a duty of care to avoid causing harm to others and that they are thus usually liable for injuries their negligence inflicts." *Southern Cal. Gas Leak Cases*, 441 P.3d 881, 885 (Cal. 2019). The California Supreme Court has identified multiple factors that help determine whether a departure from this general duty is warranted—foreseeability and certainty of harm, connection between conduct and injury, moral blameworthiness, prevention of future harm, burden on defendant, and availability of insurance—but "the inquiry hinges … on a comprehensive look at the sum total of the policy considerations at play in the context" at issue. *Id.* Here, all

these factors, and the sum of policy considerations, demonstrate that Robinhood is not exempt from the duty of care that everyone else owes under California law. Robinhood understood its capital requirements, understood that failing to meet those capital requirements could result in significant harm to clients, understood that the trading volume it was promoting would require appropriate infusions of capital, and admitted that implementing trading restrictions instead of shouldering the cost of capital infusions would harm Robinhood's clients. This is enough to state a claim for negligence by a stockbroker in the performance of its duties, and a factfinder could surely find the duty was breached. *See Twomey v. Mitchum, Jones & Templeton*, 69 Cal.Rptr. 222, 238-43 (Cal. Ct. App. 1968) (based on the evidence, "trial court was warranted in finding that [stockbroker] defendants acted … negligently[] … in handling plaintiff's investment account").

### 2.    *The Economic Loss Rule Does Not Bar Plaintiffs' Claims.*

The district court held that California's economic loss rule bars Plaintiffs' negligence claims. Specifically, the court rejected Plaintiffs' argument that the stockbroker-client relationship qualifies as an exception to the rule. App. 560. But the intervening decision in *Sheen v. Wells Fargo Bank, N.A.*, 505 P.3d 625 (Cal. 2022), controls and demonstrates that the district court erred. *Sheen* clarified that while the economic loss rule typically applies to parties in contractual privity, there are at least two exceptions: (1) "cases involving … contracts for professional

47

services," or (2) where the negligence is independent of the contract. *Id.* at 633, 637. Both exceptions apply here.

First, *Sheen* held that for professional-services contracts "a cause of action for negligence ensures that the consumer receives the services the professional agreed to provide." *Id.* at 639. *Sheen* cited a section of the Third Restatement that explains a "professional is subject to duties founded in both tort, a public source, and contract, a private source." Restatement (Third) of Torts: Liab. for Econ. Harm §4 cmt. a (2020). These duties "coexist" and do not derogate from each other; "[u]sually a professional who breaches one of those duties will also breach the other," and an injured plaintiff is not barred from pursuing either remedy. *Id. See also Ross v. AT&T Mobility, Inc.*, 2020 WL 9848766, at *13 (N.D. Cal. May 14, 2020) ("The economic loss rule does not apply … where the contract between the parties does not involve the sale of goods or products….").

Under California law, stockbrokers are the type of professionals to whom the *Sheen* exception applies. *Compare Sheen*, 505 P.3d at 637 (citing a legal malpractice case as an example of the professional-service relationship excepted from the economic loss rule), *with Moreno v. Sanchez*, 131 Cal.Rptr.2d 684, 689-90 (Cal. Ct. App. 2003) (listing "stockbrokers" along with "attorneys" on list of "professionals" where "relationship between the parties is one of special trust … involving a fiduciary, confidential[,] or privileged relationship" and justifies exception to normal

48

tort rules). *See also Twomey v. Mitchum, Jones & Templeton*, 69 Cal.Rptr. 222, 246 (Cal. Ct. App. 1968) ("fiduciary relationship" between stockbroker and client justifies exception to normal accrual rules for negligence claims).

Applying the professional-services exception makes particular sense here because it is partly justified by the asymmetric power in such relationships: "most clients do not know enough to protect themselves by inspecting the professional's work or by other independent means." Rest. (Third) §4 cmt. a. That rationale applies doubly here because Robinhood recruited novice clients. Compl. ¶109. As Robinhood itself told the SEC, it "take[s] … seriously" its "responsibility to" its novice clients who "are using Robinhood to enter the financial markets for the first time." Compl. ¶122.

Second, the negligence here is "independent of [] the parties' underlying contract[]" because the "conduct [was] both intentional and intended to harm." *Sheen*, 505 P.3d at 633. Robinhood intentionally created, ignored, and concealed its "redline" status, intentionally imposed the PCO restrictions to tank the price of the Suspended Stocks, and did these things fully knowing it was "a bad outcome for customers." Compl. ¶251.

## IV. THE DISTRICT COURT ERRED IN DISMISSING IMPLIED-COVENANT-OF-GOOD-FAITH-AND-FAIR-DEALING CLAIM (COUNT V).

All California contracts impose upon the parties a duty of good faith and fair dealing. *Carma Developers, Inc. v. Marathon Development Cal., Inc.* 826 P.2d 710,

726 (Cal. 1992).  A party breaches that covenant through "a conscious and deliberate act" that "unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement."  *Careau & Co. v. Security Pac. Bus. Credit, Inc.*, 272 Cal.Rptr. 387, 399-400 (Cal. Ct. App. 1990).  Further, a party acts in bad faith "if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable."  *Carma Developers*, 826 P.2d at 727; *see also Best Buy Stores, L.P. v. Manteca Lifestyle Ctr., LLC*, 859 F.Supp.2d 1138, 1151-52 (E.D. Cal. 2012) ("bad faith" includes "objectively unreasonable conduct," such as "inaction, subterfuge, lack of diligence, evasion of the spirit of the bargain, and abuse of power").

Here, the core purpose of the Agreement is for Robinhood to provide clients with brokerage services.  *See* Agrmt. at 1 ("In consideration of Robinhood … opening one or more accounts on my behalf … for the purchase, sale or carrying of securities … I agree to the terms set forth below…."); *id.* §4 ("I appoint Robinhood Financial as My agent for the purpose of carrying out My directions … with respect to the purchase and sale of securities."); *id.* §6 ("Robinhood Securities will clear all transactions, on a fully-disclosed basis."); Compl. Ex. B §2 ("Robinhood Financial offers brokerage services to retail investors…. Robinhood Securities … services your account by executing, clearing and settling your trades.").  In exchange, clients agree to permit Robinhood to make profits off of their accounts and orders.  *See id.*

50

§3 ("Revenue Robinhood [r]eceives" includes "[r]ebates from market centers to which we route customer orders."). Plaintiffs adequately allege that Robinhood deliberately and in bad faith frustrated these core purposes by shutting down the very trading for which Plaintiffs contracted. Compl. ¶¶326-33. Not only were Robinhood's deliberate acts "objectively unreasonable," *Best Buy*, 859 F.Supp.2d at 1151-52, Robinhood admittedly acted with knowledge that its actions were "bad … for customers." Compl. ¶251.

The district court dismissed this claim by concluding that it is legally *impossible* for Robinhood to act in bad faith because section 5.F of the Agreement "expressly allows Robinhood … to limit trading from customer accounts." App. 587-88. Yet, far from being vitiated, the implied covenant "finds particular application in situations where one party is invested with a discretionary power affecting the rights of another." *Carma*, 826 P.2d at 726. "Such power must be exercised in good faith." *Id.* Here, Robinhood failed to do so, suspending trading not because it furthered the purpose of the contract, but because it served Robinhood's self-interest. Time and again, Robinhood could have performed its duties in a good-faith manner but opted otherwise. It could have maintained the supervisory system required by FINRA, but did not. Compl. ¶¶161-63. It could have met its NSCC capital requirements, but flatly refused. *Id.* ¶15 ("We aren't paying 3B worth."). It could have reacted to the short squeeze as did conventional

51

brokerages, but did not. *Id.* ¶253. Indeed, after it benefitted from a reduction in the capital requirement, *and met that requirement*, Robinhood could have kept trading open, but did not. *Id.* ¶235. The point of Robinhood's action was to stop the stock rally—the one it had promoted and enabled—in order to crash prices and frustrate its clients' trading directives and goals. This is quintessential bad faith, and these substantial allegations are sufficient to survive a motion to dismiss. *See Careau*, 272 Cal.Rptr. at 399 n.17 ("bad faith action" includes that done "with the motive intentionally to frustrate the [other party's] enjoyment of contract rights").

The district court relied on cases holding that the implied covenant is vitiated where contract clauses granted unfettered discretion that would not render the contract illusory. App. 588-89 (citing *Third Story Music, Inc. v. Waits*, 48 Cal.Rptr. 2d 747, 753 (Cal. Ct. App. 1995); *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 122 Cal.Rptr. 2d 267, 277-78 (Cal. Ct. App. 2007); *Wolf v. Walt Disney Pictures & Television*, 76 Cal.Rptr. 3d 585, 597 (Cal. Ct. App. 2008)). But these cases are inapplicable here for two independently sufficient reasons.

First, subsequent cases have clarified that the critical distinction is whether a clause grants discretion over *whether* to fulfill that obligation *at all* (such that the implied covenant does not apply) or *when or how* to fulfill an obligation (such that the implied covenant applies). *See, e.g.*, *Best Buy*, 859 F. Supp. 2d at 1152 (citing *Locke v. Warner Bros., Inc.*, 66 Cal.Rptr.2d 921 (Cal. Ct. App. 1997)); *Stonebrae,*

*L.P. v. Toll Bros.*, 2010 WL 1460208, at *1 (N.D. Cal. Apr. 8, 2010); *Hebei Hengbo New Materials Tech. Co. v. Apple, Inc.*, 344 F.Supp.3d 1111, 1129 (N.D. Cal. 2018)).  Section 5.F cannot be read to grant Robinhood unfettered discretion over whether to execute client trades *at all* because that would transform Robinhood into a discretionary broker.  And Robinhood expressly disclaims any such authority, both in section 5 of the Agreement and in this litigation.  *See* Agrmt. §5A ("My Account is self-directed, and … I agree that neither Robinhood nor any of its employees … make discretionary trades"); App. 395 ("Robinhood provides an online trading platform on which customers self-direct their finances."); App. 415 ("Robinhood serves as a non-discretionary broker" and "Plaintiffs (like all customers) agreed that their accounts are self-directed").  Against that backdrop, the Agreement provides Robinhood only limited discretion over *when* or *how* to provide those services.  It says Robinhood will "take such … steps as are reasonable to carry out [the client's] directions," indicating that the discretion granted concerns how and when, not whether, to carry out those directives.  That discretion remains subject to the implied covenant of good faith and fair dealing, and whether it was breached is a "question of fact" not subject to dismissal at the pleading stage.  *See Haggarty v. Wells Fargo Bank, N.A.*, 2011 WL 445183, at *2 (N.D. Cal. Feb. 2, 2011) (denying motion to dismiss and questioning whether the defendant "exercised its contractual

discretionary authority in good faith" notwithstanding contract clause providing defendant with "sole discretion").

Second, *Storek* explains that even "when a party is given absolute discretion by express contract language, the courts will imply a covenant of good faith and fair dealing to limit that discretion in order to … avoid finding that the promise is illusory." 122 Cal.Rptr. at 278. Here, the very first line of the Agreement states the promise and purpose of the contract: "In consideration of Robinhood … opening one or more accounts on my behalf … *for the purchase, sale or carrying of securities or contracts relating thereto* … I … agree … to the terms set forth below." Agrmt. at 1. If Robinhood has absolute discretion—at all times, indefinitely, and for any reason or no reason—to not permit the purchase, sale, or carrying of securities, then the contract is illusory.

## V.    THE DISTRICT COURT ERRED IN DISMISSING IMPLIED-DUTY-OF-CARE CLAIM (COUNT IV).

California law creates a duty "of universal application as to all persons who by contract undertake professional or other business engagements requiring the exercise of care, skill and knowledge; the obligation is implied by law and need not be stated in the agreement." *Roscoe Moss Co. v. Jenkins*, 130 P.2d 477, 481 (Cal. 1942); *see also N. Am. Chem. Co. v. Superior Ct.*, 69 Cal.Rptr.2d 466, 470-71 (Cal. Ct. App. 1997) ("duty of care … requires … services be performed in a competent and reasonable manner"); *Holguin v. Dish Network LLC*, 178 Cal.Rptr.3d 100, 114

(Cal. Ct. App. 2014).  Hence, when Robinhood contracted to provide brokerage services to its clients, it undertook a duty to provide those services with due care and faithfulness.  The Complaint alleges the many ways in which Robinhood breached this duty, from failing to manage risk within the brokerage to imposing trading restrictions intended to impose a "bad … outcome" on clients.

The district court nonetheless dismissed this count on the theory that "the implied *term* Plaintiffs allege exists would contradict the Customer Agreement's express text" because the Agreement includes a "plain authorization to restrict trading."  App. 583 (emphasis added).  But this confuses the nature of the implied duty under California law.  The *term* at issue is express: Robinhood agreed to provide brokerage services to its clients.  The question is whether Robinhood exercised reasonable care while performing that term.  *See Holguin*, 229 Cal. App. 4th at 1324 (contrasting implied terms with implied duties and noting that, while "a written contact is generally limited to its terms," that does not undo "the well-settled principle that express contractual terms give rise to implied duties, violations of which may themselves constitute breaches of contract").

## VI.  THE DISTRICT COURT ERRED IN DISMISSING TORTIOUS-INTERFERENCE CLAIM (COUNT VI).

The Complaint alleges that Robinhood Markets, which is not a party to the Agreement, tortiously interfered with the contractual and business relationship Plaintiffs had with Robinhood Financial and Robinhood Securities.  Compl. ¶¶334-

55

341.  The district court dismissed this claim on the theory that the Complaint does not allege the breach of any "express" or "identifiable" provision of the Agreement. App. 591, 593.  But, as explained above, California law incorporates into every contract a duty of care and the covenant of good faith and fair dealing, *see supra* pages 49-50, 54, and a breach of these covenants *is* a breach of contract.  *See, e.g.*, *Bus. Credit Mgmt. Inc. v. Med. Faculty Assocs. Inc.*, 2012 WL 13012683, at *2 (C.D. Cal. Aug. 8, 2012) (citing and quoting 1 Witkin, Summary of California Law (Contracts) §800).  Thus, the Complaint adequately states a claim by alleging that Robinhood Markets "procured the breaches of implied contractual duties."  Compl. ¶338; *see also Woods v. Fox Broadcasting Sub., Inc.*, 28 Cal.Rptr.3d 463, 473 (Cal. Ct. App. 2005).

## VII.  To the Extent Additional Factual Allegations Are Necessary To State a Claim, Plaintiffs Should Be Given Leave to Amend.

In the briefing below, Plaintiffs sought leave to amend the Complaint if the district court concluded Plaintiffs failed to state claims.  App. 584.  The district court held amendment would be "futile" based on its view that section 5F of the Agreement absolves Robinhood of any liability under every conceivable set of facts. App. 597-98.  If this Court does not adopt that extreme holding but still finds a deficiency in any claim, the Court should remand to permit Plaintiffs to amend the Complaint to conform to this Court's assessment of the bounds of legal duties.  This case involves emerging technologies and an unprecedented action by a stockbroker

that eviscerated billions of dollars in market value, a scenario that easily satisfies Rule 15's admonition to "freely grant leave when justice so requires." Fed. R. Civ. P. 15; *see also Thomas v. Farmville Mfg. Co., Inc.*, 705 F.2d 1307, 1307-08 (11th Cir. 1983) ("[L]eave to amend is particularly appropriate following dismissal of a complaint for failure to state a claim.").

## CONCLUSION

For the foregoing reasons, the judgment below should be reversed.

Respectfully submitted,

*s/ Jesse Panuccio*

|  |  |
|---|---|
| Natalia M. Salas | Jesse Panuccio |
| James L. Ferraro | Carl Goldfarb |
| James Ferraro, Jr. | BOIES SCHILLER FLEXNER LLP |
| Sean A. Burstyn | 401 E. Las Olas Blvd., Ste. 1200 |
| Angelica Novick | Fort Lauderdale, FL 33301 |
| Daniel J. DiMatteo | Tel: (954) 356-0011 |
| THE FERRARO LAW FIRM, P.A. | |
| 600 Brickell Ave., Ste. 3800 | Brianna S. Hills |
| Miami, FL 33131 | BOIES SCHILLER FLEXNER LLP |
| Tel: (305) 375-0111 | 55 Hudson Yards |
| | New York, NY 10001 |
| Rachel W. Furst | Tel: (212) 754-4542 |
| GROSSMAN ROTH YAFFA COHEN, P.A. | |
| 2525 Ponce de Leon Blvd., Ste. 1150 | |
| Coral Gables, FL 33134 | |
| Tel: (305) 442-8666 | |

*Counsel for Appellants*

57

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS</u>

**Type-Volume**: This brief complies with the type-volume limits of FRAP 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by FRAP 32(f) and 11th Cir. Rule 32-4, this document contains 12,969 words.

**Typeface and Type-Style**: This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) as this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

*s/ Jesse Panuccio*
Jesse Panuccio

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on June 23, 2022, a copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system and served on counsel of record either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically generated notices of filing.

*s/ Jesse Panuccio*
Jesse Panuccio