[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10669

_____

In re: JANUARY 2021 SHORT SQUEEZE TRADING LITIGATION,

_____

ANDREA JUNCADELLA,

EDWARD GOODAN,

WILLIAM MAKEHAM,

MARK SANDERS,

JAIME RODRIGUEZ, et al.,

                                        Plaintiffs-Appellants,

*versus*

ROBINHOOD FINANCIAL LLC,

ROBINHOOD SECURITIES, LLC,

ROBINHOOD MARKETS, INC.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket Nos. 1:21-md-02989-CMA,
1:21-cv-20414-CMA

_____

Before JILL PRYOR and GRANT, Circuit Judges, and MAZE,* District
Judge.

GRANT, Circuit Judge:

Like so many other industries, retail investing has been
transformed by the internet. Once upon a time, a person who
wanted to trade stocks needed a flesh-and-blood stockbroker.
Now, most anyone with a smartphone and a bank account can
trade stocks from the comfort of their own home.

Sometimes that goes well; other times not. In January
2021, many customers of the online financial services company
Robinhood were aggressively buying specific stocks known as
"meme stocks" in a frenzy that generated widespread attention.
This phenomenon brought Robinhood additional revenue and a

_____

* The Honorable Corey L. Maze, United States District Judge for the
Northern District of Alabama, sitting by designation.

huge number of new customers, but it also exposed the company to unprecedented regulatory compliance risk.   Robinhood then made a high-profile and controversial decision: it suddenly restricted its customers' ability to buy these meme stocks (but not their ability to sell them).   Some Robinhood customers who could not buy the restricted stocks brought this putative class action, seeking to represent both Robinhood customers and all other holders of the restricted meme stocks nationwide who sold the stocks during a certain period.   As Robinhood customers, they allege that they lost money because Robinhood stopped them from acquiring an asset that would have continued to increase in value. And as stockholders, they allege that Robinhood's restriction on purchasing the meme stocks caused the price of their stocks to fall.

The plaintiffs fail to state a claim—their contract with Robinhood gives the company the specific right to restrict its customers' ability to trade securities and to refuse to accept any of their transactions.   Because Robinhood had the right to do exactly what it did, the plaintiffs' claims in agency and contract cannot stand.   And under basic principles of tort law, Robinhood had no tort duty to avoid causing purely economic loss.   We thus affirm the district court's dismissal of the claims.

## I.

### A.

The company known as "Robinhood" is a collection of distinct entities, three of which are relevant here: Robinhood Markets, Inc., Robinhood Financial LLC, and Robinhood

Securities, LLC.[1]    Robinhood Markets is the parent corporation, with its principal place of business in California.    Robinhood Financial is an "introducing broker-dealer," with its principal place of business in California, and is the company that Robinhood's customers actually interface with whenever they use the Robinhood app.    It "introduces" its customers to the market by showing them financial products that they can buy and processing trade requests.    The last of the three companies is Robinhood Securities, a "clearing broker-dealer," with its principal place of business in Florida.[2]    When Robinhood Financial accepts one of its customers' requests to buy a stock, it forwards that request to Robinhood Securities.    Robinhood Securities then finds a "market maker" who is willing to sell the stock and submits the trade to the National Securities Clearing Corporation to clear the transaction. The trade is finalized two days after that submission.

Robinhood's popularity reached new heights in January 2021.    That's when several "meme stocks" became a phenomenon in the retail investment community—especially among young, relatively new investors who followed investing trends online.    Take for example the stock of GameStop Corporation, which became the most prominent of the meme

---

[1]  When the distinction between these entities does not matter, we simply refer to "Robinhood" for ease of reading, even when describing actions that were formally taken by only one or two of these Robinhood entities.

[2]  All three entities are incorporated in Delaware.

stocks.[3]    Sec. Exch. Comm'n, Staff Report on Equity and Options Market Structure Conditions in Early 2021 2 (Oct. 14, 2021). Several institutional investors were shorting GameStop stock (which means, in effect, that they were betting that its price would go down).    *Id.* at 21.    And social media platforms, most notably the subreddit WallStreetBets, soon hosted vigorous discussions about GameStop.    *Id.* at 17.    Some of this discussion pushed GameStop as a wise investment because of potential improvements in the company.    *Id.*    Other chatter emphasized the possibility of a "short squeeze."    *Id.*    The theory behind a short squeeze is that, if coordinated purchases of a stock drive its price up, those shorting the stock will be forced to cover their position by buying the very stock they are shorting, creating a positive feedback loop in which the price continues to rise, affecting increasing numbers of short sellers, who then buy even more of the affected stock, and so on.    *Id.* at 25.

Whatever the exact motivations, purchases of GameStop shares surged.    *Id.* at 21, 26–27.    As a result, the closing price of the stock rose more than 700% between January 21 and January 27. *In re: Jan. 2021 Short Squeeze Trading Litig.*, 584 F. Supp. 3d 1161, 1174 (S.D. Fla. 2022).    And similar (though less drastic) price

---

[3] The specific "meme stocks" identified by the plaintiffs are GameStop (GME), Blackberry Ltd. (BB); Nokia (NOK); AMC Entertainment Holdings, Inc. (AMC); American Airlines Group, Inc. (AAL); Bed Bath & Beyond, Inc. (BBBY); Castor Maritime, Inc. (CTRM); Express, Inc. (EXPR); Koss Corporation (KOSS); Naked Brand Group Ltd. (NAKD); Sundial Growers, Inc. (SDNL); Tootsie Roll Industries, Inc. (TR); and Trivago NV (TRVG).

increases occurred for other meme stocks.    *See* Staff Report on Equity and Options Market at 2, 32, 43.    Naturally, more than just a few online retail investors started paying attention.    And that led to a large increase in Robinhood users, as more than 3 million people downloaded the app in January, at one point making it the top app in the Apple App Store.    *Id.* at 16 n.53; *In re: Jan. 2021 Short Squeeze Trading Litig.*, 584 F. Supp. at 1174.

While this volume of trading was good for Robinhood's business, it also raised serious regulatory compliance challenges. Because of the two-day lag between a trade agreement and its clearing by the National Securities Clearing Corporation, the market maker (who sells the stock) has a two-day wait between when it agrees to sell the stock to Robinhood (who facilitates the transaction) and when it actually gets the money from the individual Robinhood customer (who is the ultimate purchaser). That delay introduces risk for the market makers in the transaction—the person who bought the stock might not have the money two days later.    To guard against that risk, clearing brokers like Robinhood Securities are required to post their own money (not their customers' money) as collateral every day with the National Securities Clearing Corporation, with severe penalties for a failure to do so.    The amount of collateral, broadly speaking, depends on the amount of risk that the market maker faces.    And the amount of risk depends on both the volume of trading and the volatility of the stock price.    The upshot is that, if a stockbroker experiences a sudden surge of demand for stocks with rapidly changing prices, it is going to need a lot of cash as collateral.    *See*

22-10669                 Opinion of the Court                          7

*generally* Matt Levine, *Meme Stocks Were Too Good to Robinhood*, Bloomberg (June 27, 2022, 2:24 PM), https://www.bloomberg.com/opinion/articles/2022-06-27/matt-levine-s-money-stuff-meme-week-was-too-good-to-robinhood [https://perma.cc/PSV3-A43M].

When Robinhood had unprecedented trading volumes in extremely volatile stocks, the market makers faced an unprecedented amount of risk in the two-day clearing process. The National Securities Clearing Corporation, in response, required Robinhood Securities to meet unprecedented collateral requirements.   Just past 5 a.m. on January 28, Robinhood learned that it needed to deposit more than $3 billion of additional collateral by 10 a.m.; its total collateral requirement had been $282 million the previous morning, and $125 million three days earlier. The National Securities Clearing Corporation soon reduced Robinhood's $3 billion collateral deficit to about $734 million, but even that amount was large enough that Robinhood Securities needed to borrow money from its parent, Robinhood Markets. And the very next day, Robinhood's deposit requirement leapt back to over $1 billion; it covered the amount thanks to fundraising from investors.

The continuing market volatility and high trading volume meant Robinhood's high collateral requirements were also likely to continue.   So, beginning on January 28, Robinhood placed "position closing only" restrictions on certain meme stocks and related options.   That meant that Robinhood customers could

still *sell* any shares of the stock that they had already purchased on the platform, but they could not *buy* any new shares.    Over the next week, Robinhood imposed a variety of restrictions on purchasing the meme stocks, which the plaintiffs claim affected the entire market for the stocks, driving down prices by artificially restricting demand and spooking holders into selling their shares.

## B.

Robinhood's decision to suspend purchases of meme stocks was controversial, and a lawsuit was filed against Robinhood in federal district court less than 24 hours after the first restrictions. Similar lawsuits followed across the country—primarily against Robinhood, but also against other brokers who implemented restrictions on trading during the meme stock surge.    The Judicial Panel on Multidistrict Litigation consolidated federal cases involving shared factual questions about brokers' restrictions on the trading of meme stocks in the Southern District of Florida for pretrial proceedings.    The MDL court then divided the MDL into "tranches" depending on the defendant and the type of claim and ordered all plaintiffs bringing state-law claims against Robinhood to file a single master complaint.    The parties stipulated that the consolidated master complaint would supersede the original individual complaints.

The plaintiffs' amended master complaint brings seven counts against varying combinations of Robinhood's corporate entities: (I) negligence; (II) gross negligence; (III) breach of fiduciary duty; (IV) breach of the implied duty of care; (V) breach of the

implied covenant of good faith and fair dealing; (VI) tortious interference with contract and business relationship; and (VII) civil conspiracy.   The plaintiffs sought to represent two nationwide classes: one of Robinhood customers who were in some way affected by the restriction (the Robinhood class), and another of all persons in the United States who sold *any* meme stocks during a particular period, whether or not they personally traded on Robinhood (the nationwide investor class).   The plaintiffs sought to bring their two negligence claims on behalf of both classes and their other five claims on behalf of only the Robinhood class.   The plaintiffs also argued that California law should apply to their implied contract claims, but that Florida law should apply to the rest.

Robinhood moved to dismiss all seven counts.   It argued that California law applied to all seven claims.   And on the merits, it made three primary arguments.   *First*, it argued that it owed no duties at all to the putative nationwide investor class.   *Second*, for the negligence claims brought by the putative Robinhood class, it argued that it had no tort duty to avoid causing economic loss to its customers.   *Third*, for the other claims by the putative Robinhood class, Robinhood pointed to the text of its customer agreement, arguing that its language granting Robinhood the right to refuse to execute specific trade requests foreclosed the plaintiffs' claims.

That agreement was signed by all Robinhood customers before they used the company's app, and both Robinhood

Financial and Robinhood Securities (but not Robinhood Markets) are parties to it.   Section 5A of the agreement established that Robinhood accounts are "self-directed"—Robinhood did not "provide investment advice," "recommend any security, transaction or order," or "make discretionary trades."   And parts of two sections of the agreement granted Robinhood a discretionary right to refuse to execute trades:

> § 5F: I understand Robinhood may at any time, in its sole discretion and without prior notice to Me, prohibit or restrict My ability to trade securities.

> § 16: I understand that Robinhood may, in its discretion, prohibit or restrict the trading of securities, or the substitution of securities, in any of My Accounts. . . . I understand that Robinhood may at any time, at its sole discretion and without prior notice to Me: (i) prohibit or restrict My access to the use of the App or the Website or related services and My ability to trade, (ii) refuse to accept any of My transactions, (iii) refuse to execute any of My transactions, or (iv) terminate My Account.

The MDL court granted Robinhood's motion to dismiss. For the five claims where the parties disputed whether California or Florida law applied, it declined to decide the issue, concluding that all five counts failed to state a claim under both California and Florida law.   And it held that the two implied contract counts failed to state a claim under California law.   It also determined

that giving the plaintiffs leave to amend the complaint would be futile.    The plaintiffs appealed to this Court.

## II.

Taking all the plaintiffs' factual allegations as true, we review de novo both a district court's dismissal for failure to state a claim and its determination that amendment of a complaint would be futile.    *Lamirand v. Fay Servicing, LLC*, 38 F.4th 976, 979 (11th Cir. 2022); *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1336 (11th Cir. 2010).

## III.

Like the district court, we decline to resolve the parties' choice-of-law dispute.    Because the master complaint superseded the original complaints, the Southern District of Florida was the forum for pretrial purposes.    *Cf. Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 413 n.3 (2015).    As a federal district court sitting in diversity in Florida, the MDL court correctly applied Florida choice-of-law rules.    *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007).    And under Florida choice-of-law rules, a court need not resolve a choice-of-law dispute if there is a "false conflict," such that the different laws point to the same outcome under the facts of the case.    *See Tune v. Philip Morris Inc.*, 766 So. 2d 350, 352–53 (Fla. Dist. Ct. App.

2000).[4]    Like the district court, we think that California and Florida law point to the same outcome.

## IV.

We begin our analysis with Count III: the putative Robinhood class's claim for breach of fiduciary duty.[5]    The plaintiffs argue that Robinhood owed its customers fiduciary duties, including to refrain from putting its own interests in front of those of its customers, plus a specific fiduciary duty to provide those customers with "an open trading platform free of self-imposed trading restrictions."    They say that Robinhood breached these duties by restricting their ability to buy shares of the meme stocks on Robinhood.    We disagree.[6]

Under both California and Florida law, a plaintiff alleging a breach of fiduciary duty must show that a fiduciary duty exists, that a breach of that duty occurred, and that the breach proximately caused harm.    *See Brown v. Cal. Pension Adm'rs & Consultants Inc.*, 52 Cal. Rptr. 2d. 788, 796 (Ct. App. 1996); *Gracey v. Eaker*, 837 So.

---

[4] In the absence of a directly on-point state Supreme Court decision, this Court treats state intermediate appellate courts as the authoritative statement of state law unless there is persuasive reason to believe that the state Supreme Court would decide the question differently.    *United States v. Hill*, 799 F.3d 1318, 1322 (11th Cir. 2015).

[5] We address the plaintiffs' claims in the following order: Count III, Count V, Count IV, Counts I and II, Count VI, Count VII.

[6] The plaintiffs do not argue that the customer agreement is unconscionable, void against public policy, or otherwise unenforceable.    We thus assume that the agreement is enforceable.

2d 348, 353 (Fla. 2002).    The parties disagree on the first prong, duty—whether Robinhood had a fiduciary obligation to execute the requested trades.

A fiduciary duty is the duty of one person to act in the best interest of another.    Restatement (Second) of Agency § 13 cmt. a (Am. L. Inst. 1958).    Fiduciary relationships are generally between a principal and an agent; a lawyer's relationship with her client is one example.    *Id.* § 1 & cmt. e.    But such duties are not unlimited; an agent is a fiduciary only "with respect to matters within the scope of his agency."    *Id.* § 13; *cf. also, e.g.*, *Van de Kamp v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 251 Cal. Rptr. 530, 551 (Ct. App. 1988); *Bldg. Educ. Corp. v. Ocean Bank*, 982 So. 2d 37, 40–41 (Fla. Dist. Ct. App. 2008).    In other words, when someone agrees to serve as someone else's agent, the agent then must act in the best interests of the principal—but only when performing the tasks for which they agreed to be an agent.    Absent a general relationship of confidentiality between a principal and agent, an agent can still act in his own best interest when acting outside of the scope of agency, even if it comes at the expense of the principal. Restatement (Second) of Agency § 389 cmt. f.

The scope of the principal-agent relationship is defined by the agreement that creates that relationship; the "existence and extent of the duties of the agent to the principal are determined by the terms of the agreement between the parties."    *Id.* § 376; *see also id.* §§ 1, 15.    The California Court of Appeal has even applied this principle to say that "where the agreement between an agent

and the principal expressly authorizes the agent to engage in certain conduct, the agent's engagement in that conduct cannot constitute a breach of the agent's duty to the principal." *Chen v. PayPal, Inc.*, 275 Cal. Rptr. 3d 767, 780 (Ct. App. 2021).

Under both California and Florida law, these general principles apply to stockbrokers. Stockbrokers are agents of their clients and thus owe them certain fiduciary duties. *See, e.g.*, *Duffy v. Cavalier*, 264 Cal. Rptr. 740, 751–52 (Ct. App. 1989); *Ward v. Atl. Sec. Bank*, 777 So. 2d 1144, 1147 (Fla. Dist. Ct. App. 2001). But, as with other fiduciary relationships, the stockbroker's duty to act in its customers' best interests extends only to tasks where the stockbroker is acting as its customers' agent. As the California Court of Appeal has said, "the scope of the broker's fiduciary duty depends on the nature of the broker/customer relationship." *Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC*, 70 Cal. Rptr. 3d 199, 214 (Ct. App. 2007); *see also, e.g.*, *Petersen v. Sec. Settlement Corp.*, 277 Cal. Rptr. 468, 473 (Ct. App. 1991). And, while applying Florida law, this Court has said that the existence of a fiduciary duty between a broker and customer is "determined by the substantive agreement of the parties." *SFM Holdings*, 600 F.3d at 1339.

The parties mostly argue a different point—the generally understood fiduciary duties of non-discretionary brokers. Robinhood claims that it could never have had a fiduciary duty to accept trade requests from its customers because it is a non-discretionary broker. The plaintiffs disagree, contending that even non-discretionary brokers have general duties of loyalty, good

care, and good faith, and that those duties required Robinhood to execute their trade requests.

But this generalized debate is a distraction; we do not think it is helpful to dwell on the fiduciary duties of "non-discretionary brokers" in the abstract. The scope of agency between any given broker and customer is an inherently fact-intensive inquiry. *See, e.g.*, *Ward*, 777 So. 2d at 1145, 1147 (finding broader fiduciary duties for a non-discretionary broker who called client and urged him to cancel a particular requested order). Instead, we need to look at the nature of the relationship between Robinhood and its customers.

The customer agreement shows that Robinhood did not assume a duty to act in its customers' best interests in determining whether to accept their trade requests. The parties repeatedly contemplated that Robinhood had the right to *decline* to execute trade requests for any reason. As customers, all of the named plaintiffs granted Robinhood independent authority in this area: (1) the right to "at any time, in its sole discretion and without prior notice to Me, prohibit or restrict My ability to trade securities"; (2) the right to "in its discretion, prohibit or restrict the trading of securities" in "any of My Accounts" and (3) the right to "at any time, at its sole discretion and without prior notice to Me: (i) prohibit or restrict . . . My ability to trade, (ii) refuse to accept any of My transactions," and "(iii) refuse to execute any of My transactions." The Agreement narrowed the relationship:

Robinhood retained discretion to decline the plaintiffs' trade requests.

The plaintiffs try to rebuff this contractual language by arguing that Robinhood agreed to serve as their "agent for the purpose of carrying out [their] directions" and to take such "steps as are reasonable to carry out [their] directions."    They claim that this language extends far enough to show that Robinhood assumed a duty to act in their interests when deciding whether to accept their trade requests.    But they omit one key line from this section of the contract: "in accordance with the terms and conditions of this Agreement."    As a matter of ordinary contractual interpretation, Robinhood's promise to serve as the plaintiffs' agent was limited by the other terms of the agreement—including the terms granting it continued discretion to decline to execute its customers' requested trades.

Indeed, even the plaintiffs concede that stockbrokers "can limit their agency to certain functions and thus avoid fiduciary duties as to functions not undertaken."    That is all that Robinhood did here—it limited its "function" to executing trade requests *after it decided to accept them*.    Nothing in the contract suggested that Robinhood would accept all trade requests.    We fail to see how we could imply a fiduciary obligation to allow unfettered access to Robinhood's trading platform from this relationship.    *See Chen*, 275 Cal. Rptr. 3d at 780; *SFM Holdings*, 600 F.3d at 1339.    So Robinhood did not agree to act as its customers' agent when deciding whether to accept their trade requests, and

the MDL court correctly dismissed the plaintiffs' claim for breach of fiduciary duty.

## V.

We now turn to the putative Robinhood class's contract claims: Count V, for breach of the implied covenant of good faith and fair dealing, and Count IV, for breach of the implied duty of care. The parties agree that California law applies to both counts. These claims fail for the same basic reason as the breach of fiduciary duty claim: Robinhood had the express contractual right to do exactly what it did, and California courts will not read an implied contractual term to override an express one.

### A.

We first address Count V. The plaintiffs argue that Robinhood's ability to exercise its discretionary right to refuse to execute trades was limited by an implied covenant of good faith and fair dealing. And they argue that Robinhood exercised that right in bad faith, undermining the agreement and enriching itself at their expense.

California courts have sought to resolve the "apparent inconsistency" between two points of law: "that the covenant of good faith should be applied to restrict exercise of a discretionary power" and "that an implied covenant must never vary the express terms of the parties' agreement." *Third Story Music, Inc. v. Waits*, 48 Cal. Rptr. 2d 747, 750 (Ct. App. 1995). In *Third Story Music*, the California Court of Appeal clarified that "courts are not at liberty to imply a covenant directly at odds with a contract's express grant

of discretionary power except in those relatively rare instances when reading the provision literally would, contrary to the parties' clear intention, result in an unenforceable, illusory agreement." *Id.* at 753. Otherwise, "the express language is to govern, and no obligation can be implied which would result in the obliteration of a right expressly given under a written contract." *Id.* (alterations adopted and quotation omitted). Indeed, "if the express purpose of the contract is to grant unfettered discretion, and the contract is otherwise supported by adequate consideration, then the conduct is, by definition, within the reasonable expectation of the parties and can never violate an implied covenant of good faith and fair dealing." *Wolf v. Walt Disney Pictures & Television*, 76 Cal. Rptr. 3d 585, 597 (Ct. App. 2008) (quotation omitted); *see also, e.g.*, *Storek & Storek, Inc. v. Citicorp Real Est. Inc.*, 122 Cal. Rptr. 2d 267, 277–78 (Ct. App. 2002).

Applying these cases, the MDL court found that the implied covenant of good faith did not limit Robinhood's discretion under the contract. It reasoned that the contract provided other benefits to the plaintiffs besides the ability to execute trades, such as access to Robinhood's cash management services and use of Robinhood's financial literacy tools. These benefits were of real value, and they meant that the contract was not "illusory" even when Robinhood declined to let the plaintiffs execute some trades.

On appeal, the plaintiffs do not directly challenge the MDL court's conclusion that the contract provided benefits to the plaintiffs that retained their value even if Robinhood refused to

execute trades.    Instead, they argue that the MDL court wrongly applied these cases for two separate reasons.

*First*, the plaintiffs say that California courts do not apply the covenant of good faith to terms that give a party unilateral discretion about *whether* to fulfil an obligation, but that they still do apply the covenant to clauses that give a party unilateral discretion in *how* to fulfil an obligation.    *See, e.g.*, *Best Buy Stores, L.P. v. Manteca Lifestyle Ctr., LLC*, 859 F. Supp. 2d 1138, 1152 (E.D. Cal. 2012); *Locke v. Warner Bros., Inc.*, 66 Cal. Rptr. 2d 921, 927 (Ct. App. 1997).    According to the plaintiffs, the agreement must be read to give Robinhood discretion in how to execute trades, because if Robinhood could decide whether to execute trades, it would cease to be a non-discretionary broker.

This argument ignores the plain text of the agreement, which, again, gives Robinhood the right to "refuse to accept" any of the customers' transactions.    That is unambiguously a right to decide whether to do something, not discretion in how to do it. Nor is there any tension between this right and Robinhood's status as a non-discretionary broker.    Declining to execute a particular trade is different in kind from actively managing a client's investments.    So the line of cases about clauses that grant a party discretion about *whether* to perform a specific task applies—and that line of cases forbids applying the implied covenant of good faith and fair dealing to Robinhood's right to refuse to execute trades.

*Second*, the plaintiffs argue that the implied covenant limits the scope of unilateral discretionary terms whenever that discretion would make *any* express promise in the contract "illusory." They note that Robinhood promised to allow "the purchase, sale or carrying of securities or contracts" as the fundamental premise of the agreement. But, the plaintiffs say, if the discretionary right to refuse to execute trades is not limited by implied covenants, then Robinhood would have the right to break that basic promise.

This argument does not move the ball. As we understand it, all the plaintiffs are really saying is that Robinhood cannot exercise its discretionary right in a way that breaches a different express term of the agreement. If so, they are not really making an argument about the "implied covenant of good faith"— they are arguing that Robinhood breached an express term of the agreement. But the plaintiffs did not bring a claim for breach of an express term of the contract, and for good reason; Robinhood did not expressly promise to execute every trade request.[7] Count V of the plaintiffs' complaint therefore fails to state a claim.

## B.

Count IV, the claim for breach of the implied duty of care, fails for the same reasons as Count V. Robinhood's express right

---

[7] In deciding that implied covenants do not limit Robinhood's discretionary right to refuse to execute trades, we do not decide whether some hypothetical exercise of that right could still constitute a breach of an express promise of the contract.

to refuse to execute trades cannot be overridden by an implied duty. "Implied terms are justified only when they are not inconsistent with some express term of the contract and, in the absence of such implied terms, the contract could not be effectively performed. . . . The courts will not imply a better agreement for parties than they themselves have been satisfied to enter into, or rewrite contracts whenever they operate harshly." *Series AGI W. Linn of Appian Grp. Invs. DE LLC v. Eves*, 158 Cal. Rptr. 3d 193, 203–04 (Ct. App. 2013) (quotations omitted).

## VI.

We now turn to the plaintiff's negligence claims, Counts I and II.[8]   These claims fail because, under both California and Florida law, Robinhood had no duty not to cause economic loss to either the putative Robinhood class or the putative nationwide investor class.[9]

---

[8]  As is standard across common-law jurisdictions, the elements of negligence in both California and Florida are duty, breach, injury, and causation.  *See Jackson Hewitt, Inc. v. Kaman*, 100 So. 3d 19, 27–28 (Fla. Dist. Ct. App. 2011); *Brown v. USA Taekwondo*, 276 Cal. Rptr. 3d 434, 440 (2021).   At this motion-to-dismiss stage, the parties contest only the question of duty.   At no point in their opening brief do the plaintiffs distinguish the question of duty for their negligence and gross negligence claims, so we analyze them together.

[9]  The putative nationwide investor class raises separate choice-of-law issues that were not briefed before this Court or addressed by the court below.   Any harm to the named plaintiffs from the decrease in the price of the stock was experienced not in their capacity as Robinhood customers who could not execute trades, but in their capacity as shareholders of the meme stocks.

## A.

We start by applying California law to the putative Robinhood class. In California, the "economic loss rule" means that "[i]n general, there is no recovery in tort for negligently inflicted purely economic losses, meaning financial harm unaccompanied by physical or property damage." *Sheen v. Wells Fargo Bank, N.A.*, 290 Cal. Rptr. 3d 834, 842 (2022) (quotation omitted). A subset of this rule known as the "contractual economic loss rule" bars "claims in negligence for pure economic losses in deference to a contract between litigating parties." *Id.* at 842–43. The rationale behind both rules is that contract law, rather than tort law, best allows parties with an economic relationship to "make dependable allocations of financial risk without fear that tort law will be used to undo them later." *Id.* at 843 (quoting Restatement (Third) of Torts, Liability for Economic

---

That impacts the argument that the customer agreement's choice-of-law clause applies to this claim, and it also affects the application of Florida's choice-of-law rules. Furthermore, many absent class members in the putative nationwide investor class were not Robinhood customers at all, and therefore did not sign the customer agreement. So for both named and absent class members, it is not obvious that Florida's choice-of-law rules would point to the application of either Florida or California law for these claims. Because the plaintiffs do not identify any other possible jurisdictions where their claims would succeed, we consider any argument that another jurisdiction's law might lead to a different outcome to be forfeited and apply only California and Florida law. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). But we do not decide what law applies to any named plaintiff or absent class member for any claim (except for Counts IV and V).

Harm § 3 cmt. b (Am. L. Inst. 2020)).    "If every negligent breach of a contract gives rise to tort damages the limitation would be meaningless, as would the statutory distinction between tort and contract remedies."    *Erlich v. Menezes*, 87 Cal. Rptr. 2d 886, 893 (1999).

California's contractual economic loss rule squarely applies to these facts.    The plaintiffs had a contractual relationship with Robinhood, and they allege that Robinhood was negligent in its execution of that contract.    So the claim for "negligent breach of contract" is barred by the rule.

The plaintiffs argue that their claim stands under both of two exceptions to the economic loss rule: (1) the professional services exception, which allows recovery for negligent economic loss in "some cases involving insurance policies and contracts for professional services"; and (2) the independent tort exception, which allows recovery for torts between two contracting parties that do not actually arise out of the contractual relationship. *Sheen*, 290 Cal. Rptr. 3d at 848, 843.    Neither fits here.

Despite its name, the professional services exception does not apply to everything that seems like "professional services." For example, it does not apply to mortgage lending.    *Id*. at 848–51.    This exception is a "major departure from traditional principles of contract law" that applies only in very limited circumstances in which one party to the contract has "specialized knowledge, labor, or skill" that is "predominantly mental or intellectual."    *Id*. at 848 (quotation omitted); *N. Cntys. Eng'g, Inc. v.*

*State Farm Gen. Ins. Co.*, 169 Cal. Rptr. 3d 726, 749 (Ct. App. 2014) (quotation omitted).    In *Sheen*, the court rationalized this narrow exception by discussing an ordinary individual's inability to "check the work" of the professional, which meant that there was no choice but to trust that the professional was correctly executing tasks within his area of expertise.    *See* 290 Cal. Rptr. 3d at 851.

Here, as a non-discretionary broker, Robinhood was simply executing (or, as the case may be, declining to execute) trade requests that its customers submitted.    It was not offering any special mental or intellectual skills that its customers had to depend on.    California's professional services exception simply does not fit these facts.

As for the independent tort exception, that applies only when the duty giving rise to tort liability either (1) is "completely independent of the contract" or (2) "arises from conduct which is both intentional and intended to harm."    *Sheen*, 290 Cal. Rptr. 3d at 843 (quoting *Erlich*, 87 Cal. Rptr. 2d at 891).    It is obvious that the plaintiffs' claims are not "completely independent" of the contract, so the plaintiffs argue that Robinhood's conduct falls within the second bucket—that it was "intentional and intended to harm."    But it is not entirely clear from either their briefing or their complaint why they think that Robinhood intended to cause them harm.    The closest they get is in their complaint for gross negligence, where they say that Robinhood "took deliberate actions to hurt Plaintiffs and the Class by abruptly and unilaterally implementing one-way trading suspensions (halting of the buying,

but not the selling) designed to and foreseeably impeding additional price appreciation." But the plaintiffs did not support this statement with specific factual allegations.[10] Even at the motion-to-dismiss stage, where we take all of the plaintiffs' factual allegations as true, we can only credit specific, plausible allegations—not vague and unsupported insinuations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiffs do not adequately allege specific actions that are both "intentional and intended to harm." Because neither exception to the economic loss rule applies, it bars the putative Robinhood class's negligence claims under California law.[11]

Moving to Florida law, the terminology is slightly different, but the outcome is the same. Since 2013, Florida courts have used the term "economic loss rule" to refer to only a specific affirmative defense in products liability cases. *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos.*, 110 So. 3d 399, 400, 407 (Fla. 2013). That rule is irrelevant here. So, unlike under California law, Robinhood

---

[10] This statement is part of a pattern throughout the plaintiffs' complaint, appellate briefing, and oral argument. They repeatedly insinuate (but never quite allege) that Robinhood had a separate, ulterior motive for moving the meme stocks to position closing only: to protect the interests of the market makers, who are Robinhood's primary source of revenue, and at least some of whom were losing money due to the surge in the meme stocks' price. But these insinuations are just that—insinuations—so we do not credit them in our analysis.

[11] Because the economic loss rule bars recovery in California, we need not address plaintiffs' arguments that Robinhood otherwise owed the putative Robinhood class a duty of care under California law.

cannot merely invoke the economic loss rule and have it be the end of the matter.

Even so, the plaintiffs still need to establish that Robinhood had a duty not to cause them economic loss. The plaintiffs appear to argue that *Tiara* creates some sort of presumption in favor of such a duty, but that is incorrect. Prior to *Tiara*, in cases where the Florida Supreme Court rejected the applicability of the economic loss rule, that court still conducted an independent analysis to determine whether the defendant owed the plaintiff a tort duty in the first instance. *See Curd v. Mosaic Fertilizer, LLC*, 39 So. 3d 1216, 1223, 1227–28 (Fla. 2010), *receded from on other grounds by Lieupo v. Simon's Trucking, Inc.*, 286 So. 3d 143, 147 (Fla. 2019). *Tiara* did not change that practice. As a concurrence joined by three of the five Justices in the *Tiara* majority clarified, *Tiara* did "not undermine Florida's contract law or provide for an expansion in viable tort claims" because "[b]asic common law principles already restrict the remedies available to parties who have specifically negotiated for those remedies" and "a party still must demonstrate that all of the required elements for the cause of action are satisfied, including that the tort is independent of any breach of contract claim." 110 So. 3d at 408 (Pariente, J., concurring). Even post-*Tiara*, Florida courts have been loath to find duties not to cause economic loss. *See, e.g.*, *Tank Tech, Inc. v. Valley Tank Testing, L.L.C.*, 244 So. 3d 383, 393 (Fla. Dist. Ct. App. 2018).

So does some other part of Florida law impose a duty on Robinhood not to cause the plaintiffs economic loss through negligence?   Under Florida law, a tort duty can arise from four sources: "(1) legislative enactments or administration regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case."   *Clay Elec. Coop., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003) (quotation omitted).   In trying to find a duty here, the plaintiffs point to three different places: Florida precedent about the undertaker doctrine, Financial Industry Regulatory Authority (FINRA) rules, and "the facts of the case."[12]   None of these create the kind of economic-loss negligence duty that the putative Robinhood class needs to state a claim.

The undertaker doctrine states that, whenever someone "undertakes" to perform a service, she has a duty to perform that service carefully.   *See Clay*, 873 So. 2d at 1186.   The plaintiffs argue that this doctrine applies to Robinhood because it undertook to offer brokerage services to its customers.   But the common-law undertaker doctrine is limited to *physical* harms, not economic ones.   Restatement (Second) of Torts §§ 323, 324A (Am. L. Inst. 1965).   And the Florida District Court of Appeal has explicitly incorporated this limit from the Restatement into Florida's undertaker doctrine, calling the undertaker doctrine "inapplicable"

---

[12] FINRA is a private nonprofit corporation that oversees and regulates its member securities firms, including Robinhood Financial and Robinhood Securities.   *Turbeville v. FINRA*, 874 F.3d 1268, 1270–71 (11th Cir. 2017).

when a case did not involve "'physical harm' within the meaning of Section 323 of the Restatement (Second) of Torts (1965)." *Casamassina v. U.S. Life Ins. Co. in City of N.Y.*, 958 So. 2d 1093, 1102 (Fla. Dist. Ct. App. 2007); *cf. also, e.g.*, *Wallace v. Dean*, 3 So. 3d 1035, 1050–52 (Fla. 2009); *Clay*, 873 So. 2d at 1186 & n.3.    The plaintiffs do not point to any evidence that Florida courts have expanded the undertaker doctrine beyond its common-law scope, so that doctrine established no duty here.

Next, the plaintiffs claim that Robinhood violated FINRA's rules by failing to take sufficient risk-mitigating actions to avoid placing its "mission critical systems" at risk.    And they claim that this is enough to create a duty under Florida law.

This argument overstates the extent to which Florida law borrows negligence duties from regulatory bodies.    A "violation of a statute may be evidence of negligence, but such evidence only becomes relevant to a breach of a standard of care after the law has imposed a duty of care."    *Est. of Johnson v. Badger Acquisition of Tampa LLC*, 983 So. 2d 1175, 1182 (Fla. Dist. Ct. App. 2008).    Not every violation of a regulation creates a privately enforceable negligence duty.    *See, e.g.*, *id*. at 1182–83 (a tort duty arising out of federal regulations would "invite an unusual federal encroachment into Florida common law").    Especially here, where the plaintiffs allege economic loss arising from a contractual relationship, more is necessary to show that a regulation creates a privately enforceable tort duty.    But no Florida statute or regulation

purports to turn those rules into a specific duty to customers that is enforceable by a private right of action.

Finally, the plaintiffs point to a general principle of Florida negligence law that if, on the facts of the case, an activity foreseeably placed another person in the "zone of risk," then there is a tort law duty to exercise reasonable care to avoid foreseeable harm from the risk.    *See McCain v. Fla. Power Corp.*, 593 So. 2d 500, 503 & n.2 (Fla. 1992).    Plaintiffs argue that, because Robinhood courted novice investors and knew of the risks inherent in its capital requirements, it had a duty to avoid causing economic loss to those customers.

In general, Florida courts limit the zone-of-risk doctrine to non-economic injuries.    *See, e.g.*, *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1339–40 (11th Cir. 2012); *Monroe v. Sarasota Cnty. Sch. Bd.*, 746 So. 2d 530, 538 (Fla. Dist. Ct. App. 1999).    To be sure, in one case (uncited by the parties), the Florida Supreme Court applied the zone-of-risk doctrine to hold a defendant liable for purely economic loss.    But the facts there were quite different.    In *Curd v. Mosaic Fertilizer, LLC*, the Florida Supreme Court held that the owner of a fertilizer storage facility was liable to commercial fishermen after a dramatic release of pollutants into the Bay where they were licensed to fish.    39 So. 3d at 1218–19, 1227–28.    We have read *Curd* very narrowly, noting that the plaintiffs there had a "special interest" in physical property that was damaged, and we have held that, even after *Curd*, Florida law still has a strong presumption against a negligence duty to cause economic loss.

*Virgilio*, 680 F.3d at 1339–40, 1339 n.31.    Here, as in *Virgilio*, the plaintiffs "do not allege that *any* real or personal property was damaged."    *Id.* at 1339 n.31.

We highly doubt that Florida courts would expand a zone-of-risk negligence duty to facts like these, with no connection to the negligent damage of physical property.    Such an expansion would dramatically disrupt day-to-day economic activity.    One person's pursuit of economic opportunity is often another's foreseeable economic loss.    Indeed, the very meme stock trading that led to this litigation was an effort by some to acquire an economic benefit at an economic cost to others.    If liability arose anytime an activity created a foreseeable risk of economic harm to another, it would be endless.    The putative Robinhood class has failed to state a negligence claim under Florida law.

**B.**

Robinhood also had no tort duty to avoid causing the putative nationwide investor class an economic loss.    Under California law, the economic loss rule functions in part to avoid "imposing liability in an indeterminate amount for an indeterminate time to an indeterminate class."    *Sheen*, 290 Cal. Rptr. 3d at 842 (quotation omitted).    If Robinhood were liable to all holders of a stock any time it made a decision that caused a stock price to go down, it would have effectively limitless liability to all investors.    That untenable result is straightforwardly foreclosed by California's economic loss rule.

As for Florida law, the plaintiffs make no effort to show what could have created a general duty for Robinhood to not cause any stock price to go down.    And all three of their attempts to identify duties for the putative Robinhood class would even more clearly fail for the putative nationwide investor class.

## VII.

We can quickly resolve the plaintiffs' remaining claims. Count VI, the tortious interference with contract claim, was brought against the parent company, Robinhood Markets, for allegedly having "procured the breaches of implied contractual duties" by Robinhood Financial and Robinhood Securities.    The plaintiffs' only argument on this point depends on their arguments for Counts IV and V.    Because neither Robinhood Financial nor Robinhood Securities breached an implied contractual duty (or an express one for that matter), this claim too necessarily fails.

As for Count VII, the claim for civil conspiracy, the plaintiffs did not raise the MDL court's dismissal of that claim on appeal and have therefore abandoned any challenge to it.    *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014).

## VIII.

Finally, the plaintiffs argue that they should be allowed to allege additional facts to the extent that they are necessary to state a claim.    The plaintiffs did not file a separate motion to amend. Instead, they included in their response to Robinhood's motion to dismiss a request that they be allowed to amend their complaint if the court thought it was deficient.    If a motion for leave to amend

"simply is imbedded within an opposition memorandum" then it "has not been raised properly" and has "no legal effect." *Newton v. Duke Energy Fla., LLC*, 895 F.3d 1270, 1277 (11th Cir. 2018) (quotation omitted).    Additionally, both here and below, the plaintiffs failed to explain what additional facts they would allege if they were allowed to amend their complaint.    A motion for leave to amend must "state with particularity the grounds" justifying amendment of the complaint.    *Id.* (quoting Fed. R. Civ. P. 7(b)(1)). For both of these independent reasons, the plaintiffs were not entitled to amend their complaint.

\*        \*        \*

When Robinhood restricted its customers' ability to buy meme stocks, it took a sizable—and perhaps justifiable—hit in the court of public opinion.    But in this Court, Robinhood is only accountable for specific legal duties.    Whether in agency, contract, or tort, the plaintiffs' amended master complaint did not adequately allege that Robinhood breached a state common-law duty.    We **AFFIRM** the judgment of dismissal.